UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
TROY HOGG,

                              Plaintiff,

        -against-                                Docket No:

STEPHEN BRAVERMAN, ROZGOLD CAPITAL, LLC,
OLDE MONMOUTH STOCK TRANSFER, INC.,
and CUENTAS, INC.

                              Defendants.
----------------------------------------X


                    VERIFIED COMPLAINT

                      I. PARTIES

Troy Hogg, by his attorney, Simon Kogan, complaining of the

defendants,, hereby alleges as follows:

1. At all relevant times, plaintiff was a citizen of

Ontario, Canada.

2. Upon information and belief, at all relevant times,

defendant Stephan Braverman ("Braverman") was a citizen and

resident of California.

3. Upon information and belief, at all relevant times,

defendant Rozgold Capital, LLC ("Rozgold") was a Limited

Liability Company organized under the laws of California.

4. Upon information and belief, at all relevant times

Rozgold's principal place of business was located in

California.

5. Upon information and belief, at all relevant times, defendant Braverman was Rozgold's managing member.

6. Upon information and belief, at all relevant times defendant Olde Monmouth Stock Transfer, Inc.("Olde Monmouth") was a New Jersey corporation with its principal place of business in Atlantic Highlands, New Jersey.

7. Upon information and belief, at all relevant times, defendant Olde Monmouth was a transfer agent registered with the Securities Exchange Commission pursuant to section 78A(c) of the Securities Exchange Act of 1934.

8. Upon information and belief, at all relevant times defendant Cuentas, Inc. Formerly known as Next Group Holdings,Inc. ,In was a Florida Corporation with its principal place of business in Miami, Florida.

9. At all relevant times, Cuentas was the issuer of the securities that are the subject of this litigation.

10. Upon information and belief, at all relevant times, defendant Olde Monmouth was the transfer agent for Cuentas Inc.

## II. JURISDICTION AND VENUE

11. This court has jurisdiction over the subject matter of this action by virtue of 28USC§1331 and 15 USC §78aa.

12. Venue is proper in this Court by virtue of contract and Rule 4(f) of the Federal Rules of Civil Procedure.

13. Defendant Olde Monmouth is located less than 100 miles from the Courthouse for the Eastern District of New York.

14. This Court has jurisdiction of the pendant state claim by virtue of 28 US § 1332.

15. The amount in controversy exceeds $75,000.

## III. FACTS COMMON TO ALL CAUSES OF ACTION

16. On or about December 2018, plaintiff and defendant made a deal in which the plaintiff would advance the defendant Bitcoin to purchase 100,000 shares of Cuentas common stock and warrant. Exhibits A and B annexed hereto.

17. Plaintiff then advanced Braverman the sum of $300,000 worth of Bitcoin to be used to purchase 100,000 shares of Cuentas' common stock and a warrant to purchase in an private placement pursuant to section4(2) of the Securities

Act of 1933. A copy of the Securities Purchase Agreement for this purchase is annexed hereto as Exhibit A.

18. On about January 7, 2019, plaintiff sent Braverman "Rozgold" $50,000 in Bitcoin to complete the installment on the purchase of 100,000 shares of Cuentas Inc. common stock and the warrant, which was finalized in three installment payments in Bitcoin. See Exhibit B and Exhibit G.

19. Once Braverman received the Bitcoin he purchased the 100,000 shares of Cuentas common stock and warrant. Screen shots of purchase adhered to Exhibits B and Exhibit G.

20. Cuentas received the $300,000, for the transaction. Braverman then asked the plaintiff if he could put up $50,0000 to participate in the deal on a *pari passu* basis.

21. Plaintiff agreed and was under the belief that the defendant would be putting up $50,000 as he had stated in the deal.

22. Braverman and "Rozgold" were acting as intermediaries in the transaction which plaintiff paid for with Bitcoin, the transaction went through the defendant's company Rozgold , who then purchased the Cuentas stock on behalf of the plaintiff. Exhibit B

23. In lieu of, plaintiff inquires regarding the transference of the shares and warrant to him since the

Cuentas shares and warrant remained in "Rozgold". Defendant agreed to do so and to follow through. See: text screen shot in Exhibit D.

24. Needing to secure cooperation of the plaintiff on an even bigger business deal they were involved in at the time, defendant agreed to transfer shares and warrant. Exhibit D and E.

25. Thus, defendant began the process of filling out the appropriate paperwork rendered by Olde Monmouth Stock Transfer Agent with knowledge of all parties indexed via stream of emails. Exhibit E

26. On or about September 5, 2019, Braverman was provided stock transfer instructions on exactly what he needed to provide to transfer the shares. A copy of those instructions are annexed hereto Exhibit C and incorporated hereto by reference.

27. Thereupon, plaintiff confidently moved forward and released the assets in a separate larger joint deal with the defendant in a "good faith gesture".

28. Plaintiff did so in full belief of his expected return in the smaller deal holding his 100,000 Cuentas shares and warrant with Braverman "Rozgold".

29. Instead, Braverman completed 99 percent of the paperwork but continues to hold the stock transfer power hostage. See Exhibit E Compliance.

30. Also, Braverman and Rozgold never sent in the $50,000 as promised.

31. Braverman repeatedly assured Hogg that the shares and the warrant were his. Copies of these texts are annexed hereto as cumulative Exhibit D.

32. These text messages were followed by a series of emails that make it clear that Braverman knew precisely what was required of him to transfer the shares. Copies of these email strings are annexed hereto as Exhibits E and F.

33. On or about May 22,2020 defendant Braverman contacted Olde Monmouth to request deliver of a physical certificate for the shares. This represented at least the second time that Braverman tried to convert the shares.

34. When defendant was unable to obtain cooperation from Olde Monmouth Stock Transfer Inc. For the legend removal in preparation to steal the stock from plaintiff. See email page 1 and 2 of Exhibit F.

35. The defendant hired an attorney to assist him in the unlawful conversion of the plaintiff's rightful property of 99,334 shares of common stock, plus the purchase warrant. Exhibit F.

36. The defendant's past intentional and repetitive conversion tactics of coveting the stock share certificates and warrant after plaintiff actually paid for them are

recorded herein and attached via screen shots in Part I of Exhibit G.

37. The defendant's past withholding of the Medallion Signature Guarantee shows pre-meditation and double dealing in creating a melee of distraction and redirection to divert attention from the deal in which he coveted his ill gotten gains.

38. Furthermore, the plaintiff has no recourse but to plead with the court for a preliminary injunction and a temporary restraining order to stop the defendant from seizing his shares and warrant permanently.

As and for first Cause of action

(violation of Section 10b of the Securities Exchange At of 1934 and Rule 10b-5 promulgated thereunder)

39. Plaintiff hereby reasserts and realleges each and every allegation contained in paragraphs one through thirty-eight of this complaint as if they were more fully set forth herein.

40. As of the date of this complaint the stock traded as high as $7.10 per share. This gave the stock a market value

of $705,271.40.

41. By virtue of his conduct defendant wrongfully converted the stock violation of section 10b of the Securities Exchange Act of 1934 and rule 10b-5 promulgated thereunder.

42. As a result, of defendant Braverman's wrongful conversion of the stock, plaintiff has been damaged in an amount of at least $705,271.40 which amount will be more fully proven at trial.

As and for a second cause of action
(imposition of a constructive trust)

43. Plaintiff hereby reasserts and realleges each and every allegation contained in paragraphs one through forty-two of this complaint as if they were more fully set forth herein.

44. At all relevant times, defendants owed plaintiff a duty of care akin to that of a fiduciary.

45. Defendant Braverman and Rozgold repeatedly promised that he would transfer the shares to him.

46. Defendant Braverman and Rozgold have been unjustly

enriched at plaintiff's expense.

47. Accordingly, plaintiff asks that this court impose a constructive trust over the shares for plaintiff's benefit.

AS AND FOR A THIRD CAUSE OF ACTION

(REPLEVIN)

48. Plaintiff hereby reasserts and realleges, each and every allegation contained in paragraph one through forty-seven of this complaint, as if they were more fully set forth herein.

49. Based on the fact that the plaintiff's money was used to pay for plaintiff's shares and warrant, Mr. Hogg is clearly the rightful owner of the 99,334 shares of Cuentas common stock and that are the subject of this litigation.

50. Based on the foregoing, plaintiff is entitled to an order compelling Olde Monmouth to issue the shares and the warrant in plaintiff's name.

51. Indeed by requesting delivery of the shares and the common stock purchase warrant, Braverman is clearly attempting to steal the stock that plaintiff paid for. This Court must **not** allow this to happen.

Wherefore, plaintiff demands judgment of defendant in the amount
of $705,271.40, entry of an order directing Olde Monmouth to
issue $99,334 shares and the common stock purchase warrant to
Troy Hogg, including punitive damages in the amount to be
determined by the court, reasonable attorney fees, plus the costs
disbursements of this action.

Dated: Staten Island, New York
June 26, 2020

Yours, etc

S/Simon Kogan (sk2132)
25 Fanning Street, Room 557
Staten Island, NY. 10314
Tel: 646-983-0791
Email:simonkoganlaw@gmail.com

# ATTORNEY'S VERIFICATION

SIMON KOGAN, an attorney duly licensed to practice law before the courts of New York state, under penalty of perjury, hereby affirms as follows:

1. I have read the foregoing complaint and know the contents thereof to be true except as to those matters that are alleged upon information and belief and with respect to those matters, I believe them to be true.

2. The basis of my knowledge are conversations with the plaintiff and my review of the file.

3. The reason that this verification is made by me is that plaintiff's residence is located outside of the county in which I maintain my primary office.

Dated: Staten Island, New York

_____

S/Simon Kogan (sk2132)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TROY HOGG,

                                     Plaintiff,

         -against-                                          Docket No:


STEPHEN BRAVERMAN, ROZGOLD CAPITAL, LLC, OLDE
MONMOUTH STOCK TRANSFER, INC.,  and CUENTAS, INC.

                                     Defendants.
-------------------------------------------------------------------X


**THIS MATTER** having been  brought before the Court by Plaintiff, through his counsel, by

Order to Show Cause seeking a temporary restraining order and preliminary injunction pursuant

to Federal Rule of Civil Procedure 65 and L.Civ.R. 65.1, and upon the Complaint, Declarations

and Memorandum of Law submitted herewith the Court having determined that good and

sufficient reasons exist to proceed by way of Order to Show Cause, and for good cause shown.


**IT IS** on this 29th day of June __, 2020,


**ORDERED** that the Defendants appear and show cause on the _____ day of July, 2020, before

the United States District Court for the Eastern District of New York, Hon.

_____, at the US Courthouse, located at 225 Cadman Plaza East, Brooklyn, New

York 11201 at _____ o'clock in the _____ noon, or as soon as thereafter as counsel can be

heard why an order should not be entered.

1. Preliminarily enjoining and restraining the Defendants from taking and steps to liquidate, sell, transfer hypothecate, assigning, encumbering or otherwise disposing of any of the 99,334 shares of Cuentas, Inc. or the purchase warrant and them which are subject of this action.

2. Granting such other relief as the Court deems equitable and just.

And it is further **ORDERED** that:

3. Pending further hearing on this Order to Show Cause, defendants are temporarily enjoined and restrained from taking any steps to liquidate, sell, transfer, hypothecate, assigning, encumbering or otherwise disposing of any of any of the 99,334 shares of Cuentas stock and warrant and they which are subject to this action.

4. A copy of this Order to Show Cause, Complaint, supporting affidavits, declarations or certifications, and Memorandum of Law submitted in support of this application, together with a summons, shall be served upon the Defendants personally within _____ days of the date hereof, in accordance with FRCP 4.

5. The Plaintiff must file with the Court its proof of service of the pleadings on the Defendants no later than three (3) days before the return date.

6. Defendants shall file and serve a written response to this Order to Show Cause and proof of service by _____, 2020.

7. You must send a courtesy copy of your opposition papers directly to Judge _____, whose address is: _____, Brooklyn, New York 11201.

2

8. The Plaintiff must file and serve any written reply to the Defendants' opposition to the Order to Show Cause by _____, 2020. A courtesy copy of the reply papers must be sent directly to the chambers of Judge _____.

9. If the Defendants do not file and serve opposition to this Order to Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that the Plaintiff files a proof of service and a proposed form of Order at least three days prior to the return date.

10. If the Plaintiff has not already done so, a proposed form of If the Plaintiff has not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than three (3)days before the return date.

11. The Court will notify the parties whether it will entertain argument on Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than three (3) days before the return date. the return date of the Order to Show Cause in accordance with Local Civil Rule 7.1 .

_____

U.S.D.J.

3

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK

3

4

5  TROY HOGG                                )    DOCKET NO.
                         Plaintiff,         )
6                                           )
                                            )
      -against-                             )
7                                           )
   STEPHEN BRAVERMAN, ROZGOLD CAPITAL       )
8  LLC,  and  OLDE  MONMOUTH  STOCK         )
   TRANSFER  INC.  and  CUENTAS  INC.       )
9                                           )
                         Defendants.

10

11

12         **EMERGENCY DECLARATION OF SIMON KOGAN, ESQ. IN SUPPORT**

           **OF PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**
13
                    **AND TEMPORARY RESTRAINING ORDER**
14

15  SIMON KOGAN, ESQ., pursuant to the provisions of 28 U.S..§1746, under
16
   penalty of perjury, hereby declares as follows:
17

18  1. I am counsel for plaintiff herein and I respectfully submit this
19
   Emergency Declaration in Support of plaintiff's application for
20
   Preliminary Injunction and Temporary Restraining Order restraining the
21
   defendants from transferring, selling or otherwise disposing of the
22

Page 2 of 3

99,334 shares of Cuentas, Inc. common stock and a warrant to purchase common stock in Cuentas.

2. On or about May 16, 2020, I contacted Matthew Troster, the president of Olde Monmouth Stock Transfer Inc. to notify him of the plaintiff's adverse claim to the shares and the warrant.

3. Mr. Troster acknowledged my concerns and informed me that the shares were restricted but that he had not received a request to lift the restriction on the shares. Mr. Troster also asked me to submit an adverse claim notice.

4. The notice was submitted To Olde Monmouth on May 18, 2020. A copy of the Notice is annexed hereto as Exhibit 1.

5. Mr Troster assured me that he would notify me if he received any requests regarding the shares or the warrant.

6. On or about June 1,2020, I received an email from Olde Monmouth informing me that Mr Braverman had requested delivery of a certificate for the shares and the warrant. A copy of this email is annexed hereto as Exhibit 2.

7.This mail had the effect of opening a 30 day window for plaintiff to obtain a court order with respect to the shares and warrant.

8.This 30 day window will expire on June 30, 2020.

Page 3 of 3

1   9. Once this 30 day window expires, the shares and the warrant will be

2   released to Braverman and Rozgold who will then be in a position to sell

3   them.

4   10. If this were to happen justice would not be served.

5   11. On _____ day I emailed a copy of this application to the

6   defendants and informed them that I would be presenting the order to how

7   cause to the Court today.

8

9

10  "I declare under penalty of perjury that the foregoing is true and

11  correct".

12

13  Executed on June 26, 2020.

14

15                                              S/Simon Kogan(sk2132)

16

17

18

19

20

21

22

Page 1 of 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TROY HOGG                    )    Docket No.
                             )
              Plaintiff,     )
                             )
     -against-               )
                             )
STEPHEN   BRAVERMAN,   ROZGOLD )
CAPITAL LLC, and OLDE MONMOUTH )
STOCK TRANSFER INC. and CUENTAS )
INC.                         )
                             )
              Defendants.

---

Troy Hogg, pursuant to the provisions of 28 U.S.C.§1746, under

penalty of perjury hereby declares as follows:


1. In or about December 2018, I advanced Braverman the sum of

$300,000 to be used to purchase 100,000 shares of Cuentas common

stock and a warrant to purchase common stock in an private

placement pursuant to section 4(2) of the Securities Act of 1933.

A copy of the Securities Purchase Agreement for this purchase is

annexed hereto as Exhibit A.

2. This $300,000 was not a loan but instead represented my equity

Page 2 of 4

1    investment in Cuentas Inc.

2    3. Once Cuentas Inc. received the $300,000, Braverman asked me if

3    he could put up $50,0000 to participate in the deal on a *pari passu*

4    basis.

5    4. At the time, Braverman told me that he needed two weeks to put

6    his own $50,000 together.

7    5. Two weeks turned into two months as we were working on a much

8    larger deal.

9    6. On or about August 1, 2019, Braverman wanted me to release assets

10   for a completely separate, infinitely larger transaction.

11   7. I refused to do until Braverman and Rozgold released the stock

12   to me.

13   8. Braverman then received the proper documentation from Olde

14   Monmouth.

15   9. Braverman asked me to release assets for the larger business deal

16   but I was not willing to do so until Braverman signed over the

17   Cuentas stock.

18   10. Braverman completed 99 percent of the paperwork but continues

19   to hold the stock transfer power hostage.

20

21   11. Braverman never sent his $50,000.

22

Page 3 of 4

12. On or about September 5, 2019 Braverman was provided a detailed set of instructions that instructed him exactly on what he needed to provide Olde Monmouth to transfer the shares. A copy of those instructions is annexed hereto in Exhibit C and incorporated herein by reference.

13. In a series of texts, Braverman repeatedly assured me that the shares were mine. Copies of these texts are annexed hereto as cumulative in Exhibit D.

14. These text messages were followed by a series of emails that make it clear that Braverman comprehended precisely what was required of him to transfer the shares. Copies of these email strings are annexed hereto as Exhibits E and G (Defendant was former broker who had full knowledge of the system and how to work it)

15. Furthermore, I have caught Braverman in a series of lies both to myself and other persons. For examples of this inconsistent duplicitous behavior Exhibit E in evidence email to many.

16. No prior application for the relied requested herein has been made.

17. The last straw occurred, when on or about June 1, 2020. On that day, I learned that Braverman, once again, asked for delivery of a physical certificate for the shares and the warrant.

Page 4 of 4

1  "I declare under penalty of perjury under the laws of the United

2  States of America that the foregoing is true and correct."

3

4

5

6  Executed on June 26, 2020

7

8

9

10

11  _____

12  Troy Hogg

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TROY HOGG,

                    Plaintiff,                                   Docket No:

         -against-
STEPHEN BRAVERMAN, ROZGOLD CAPITAL LLC.,
OLDE MONMOUTH STOCK TRANSFER, INC.,
and CUENTAS, INC.

                Defendants.
-------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS APPLICATION FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Simon Kogan (sk-2132)
Counsel For Plaintiff
25 Fanning Street  Room 557
Staten Island, N.Y.10314
Tel:646-983-0791
Email: simonkoganlaw@gmail.com

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     TROY HOGG                         )    Docket No.
3                                      )
                Plaintiff,             )
4         vs.                          )
                                       )
5    STEPHEN BRAVERMAN, ROZGOLD        )
     CAPITAL LLC, and OLDE MONMOUTH    )
6    STOCK TRANSFER INC, and           )
     CUENTAS INC.                      )
7                                      )
                Defendant.             )
8    _____   )

9

10   **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS APPLICATION
     FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

11

12                    **Preliminary Statement**

13   Plaintiff hereby respectfully submits this Memorandum of Law in

14   support if his application for a Preliminary Injunction and

15   Temporary Restraining Oder restraining the defendants fr taking any

16   steps to sell, transfer or dispose of the 99,334 shares of the

17   common stock of Cuentas Inc.' common stock or purchase warrant

18   currently held by Rozgold Capital and Braverman.

19

20

21
                         Page 1 of 10
22

1                        **Statement of the Case**

2

3      In December of 2018, plaintiff advanced the sum of $300,000 in

4      Bitcoin "Braverman" Rozgold, to be used to purchase 100,000 shares of

5      Cuentas Inc.'s common stock plus a common stock purchase warrant to

6      purchase common stock in a private placement pursuant to Section4(2) of

7      the Securities Act of 1933.   15 U.S.C.§77d(2).

8

9      At the time, Braverman asked plaintiff if he could put up $50,000 to

10     participate in the deal on a *pari passu* basis.   Braverman asked for two

11     weeks to come up with his $50,000.   Two weeks rapidly became two months

12     as the parties waited for Braverman to perform. On January 7, 2019,

13     plaintiff while remaining on the phone with the defendant recorded the

14     encounter of the defendant using the plaintiff's $50,000 in Bitcoin and

15     purchasing the remainder of the Cuentas shares and purchase warrant in

16     the final and third installment. Plaintiff also asked provide a receipt

17     and the defendant did so. In the meantime, Braverman was carefully

18     plotting a strategy that would allow him to keep the shares for himself

19     in the months to come.

20

21

22                        Page 2 of 10

1 <u>**Summary of the Argument**</u>

2

3   Plaintiff has demonstrated a clear likelihood of success on the merits.

4   First, plaintiff is likely to prevail on his claim that Braverman

5   wrongfully converted the stock and the warrant. Throughout this

6   nightmare, Braverman has acknowledged that Mr. Hogg is the rightful

7   owner of the shares and the warrant. Yet, Braverman continues to

8   withhold the Medallion signature guaranteed stock transfer power.

9   This is done clearly to interfere with Mr Hogg's ownership of the

10  shares. Mr. Hogg will likely prevail on his claim to impose a

11  constructive trust over the shares and the warrant. There is no

12  question that Mr. Braverman has been unjustly enriched at

13  plaintiff's expense. Finally, there is no question that plaintiff

14  will likely prevail on his Replevin claim. In the absence of the

15  requested injunction, Mr. Hogg will be irreparably harmed because

16  he will lose his negotiated interest in Cuentas, Inc.. Any bond

17  that plaintiff should be required to post to secure the injunction

18  should be minimal.

19

20

21

22                              Page 3 of 10

1      **ARGUMENT**

2                              **I.**

3      **PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE**

4                      **MERITS OF HIS CLAIMS.**

5

6      A preliminary injunction is a "drastic remedy," and thus "is

7      appropriate only where a party has established (1) likelihood of

8      success on the merits of the pending action, (2) irreparable injury

9      absent such relief, and (3) a balancing of equities in favor of the

10     relief sought." *N.Y. Auto. Ins. Plan v. N.Y. Sch. Ins. Reciprocal*,

11     241 A.D.2d 313, 314 (1st Dept 1997) (citations omitted). The movant

12     must provide "clear and convincing" evidence as to each of these

13     three elements. See *Doe v. Axelrod*, 73 N.Y.2d 748, 750 (1988);

14     *Temple-Ashram v. Satyanandji*, 84 A.D.3d 1158, 1161 (2d Dept 2011)

15     (internal quotation marks and citation omitted).

16

17     1.Plaintiff is likely to succeed on his conversion claim.

18     Conversion is a tort by which the defendant deprives the plaintiff

19     of his right to a chattel or interferes with the plaintiff's use or

20     possession of a chattel without the plaintiff's consent and without

21

22                          Page 4 of 10

1   lawful justification."*Pittsburgh Const. Co. v. Griffith,*834 A.2d

2   572, 581 (Pa.Super. 2003). A plaintiff has a cause of action in

3   conversion if he had actual or constructive possession of a chattel

4   at the time of the alleged conversion.

5

6   *Key Corporate Capital, Inc. v. Tilley, Civil Action* No. 0k4-1652,

7   at *4 (E.D. Pa. Dec. 20, 2004).  Here plaintiff us the admitted

8   rightful owner of the common st stock and the common stock purchase

9   warrant. By refusing to provide a Medallion signature Guaranteed

10  stock power Braverman has wrongfully converted both the common

11  stock and the warrant.

12

13  C. <u>Plaintiff will likely prevail in his attempt to impose a</u>

14  <u>constructive trust over the shares and warrant.</u>

15  [A] constructive trust is the formula through which the conscience

16  of equity finds expression. When property has been acquired in such

17  circumstances hence retain the beneficial interest, equity converts

18  him [or her] into a trustee' " (*Simonds v. Simonds,* 45 N.Y.2d 233,

19  241(1978) 408 N.Y.S.2d 359, 380 N.E.2d 189, quoting *Beatty v.*

20  *Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378 ). "

21

Page 5 of 10

22

'The elements of a constructive trust are (1) a fiduciary or confidential relationship; (2) an express or implied promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment' " (*Ning Xiang Liu v. Al Ming Chen*, 133 A.D.3d 644, 644, 19 N.Y.S.3d 565, quoting Diaz v. Diaz, 130 A.D.3d 560, 561, 13 N.Y.S.3d 455 ; see *Simonds v. Simonds*, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380(1978) ; *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 ). "[A]s these elements serve only as a guideline, a constructive trust may still be imposed even if all of the elements are not established" (*Marini v. Lombardo,* 79 A.D.3d 932, 933, 912 N.Y.S.2d 693 ).

1. <u>Defendant was in a fiduciary relationship with plaintiff.</u>

As already noted, plaintiff is the rightful owner of the shares and the common stock purchase warrant. Under the circumstances of this case, Braverman must be seen as plaintiff's fiduciary.

2. <u>Defendant made a series of promises to the plaintiff.</u>

In the months immediately after plaintiff sent defendant the $300,000 in Bitcoin to be used to purchase the Cuentas common

1   shares and the common stock purchase warrant. The defendant began

2   making a series of promises to sign the stock and the warrant over

3   to the plaintiff. Defendant made assurances to the plaintiff to

4   leverage deals and entice the plaintiff to spend more of his money

5   and invest on the larger deal. There is no reason, other than to

6   believe that Braverman did make promises to plaintiff to induce him

7   to send the $300,000 in Bitcoin in the first place.

8   3. Plaintiff clearly relied on these promises.

9

10  Plaintiff clearly relied on these false promises when he sent the

    defendant $300,000 in Bitcoin.

11

12  4. Defendant has been unjustly enriched.

13  There should be no question that defendant has been enriched by

14  plaintiff's tender of  $300,000 of Bitcoin. Equity must speak to

15  protect plaintiff's investment. Thus, plaintiff asks that this

16  Court impose a constructive trust on the shares and the common

17  stock purchase warrant.

18

19

20

21
                            Page 7 of 10
22

1

**II.**

2

**PLAINTIFF WILL BE IRREPARABLY HARMED IN THE ABSENCE**

3

**OF AN INJUNCTION**

4

5 There is no question that unless this Court grants the requested

6 injunction, the defendants will begin liquidating the Cuentas

7 stock.  The loss of a negotiated interest in a business has been

8 held to constitute irreparable harm.  See *Wisdom Import Sales Co.*

9 *v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir. 2003). Hence,

10 plaintiff has established the imminent threat of irreparable harm

11 needed to justify imposition of injunctive relief.

12

**III.**

13

**A BALANCING OF THE EQUITIES HEAVILY FAVORS THE PLAINTIFF.**

14

15 Virtually none the equities tilt in favor of the defendant.

16 Instead, they all tilt in the plaintiff's favor. Thus, this Court

17 should grant the requested injunction.

18

19

20

21

22

Page 8 of 10

1

## IV.

2

### ANY BOND PLAINTIFF SHOULD BE REQUIRED TO POST SHOULD BE MINIMAL

3

Rule 65(c) requires the Court to set bond to secure the enjoined

4

party against any damages it may suffer if it were later determined

5

that plaintiff was not entitled to an injunction. Here, Cuentas

6

stands poised to up-list to NASDAQ.  Thus, there is little reason

7

to believe that Braverman o Rozgold will be damaged if they cannot

8

liquidate the Cuentas position for a period of time.  Thus, any

9

bond that plaintiff be required to post should be minimal.

10

11

12

13

14

Respectfully submitted,

15

S/Simon Kogan (sk-2132)

Counsel for Plaintiff

16

25 Fanning Street, Room 557

Staten Island, N.Y. 10314

17

Telephone: 646 - 983 - 0791

Email:simonkoganlaw@gmail.com

18

19

20

21

Page 9 of 10

22



# SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (the "Agreement"), dated as of December ___, 2018, by and between CUENTAS INC., a Florida corporation, with headquarters located at 19 W. FLAGLER ST, SUITE 902, MIAMI, FL 33130 (the "Company"), and ROZGOLD CAPITAL LLC a California limited liability company, with address at 3916 GREENWOOD ST., NEWBURY PARK, CA 91320
(the "Buyer").

## WHEREAS:

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended, and Rule 506 promulgated thereunder, the Company desires to issue and sell to Buyer, and Buyer desires to purchase from the Company units consisting of shares of the Company's Common Stock and Warrants as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company the Buyer severally (and not jointly) hereby agree as follows:

1. PURCHASE AND SALE.

a.      Definitions. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1(a):

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Closing" means the Closing.

"Closing Date" means the Closing Date.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

"Closing Date" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Buyer's obligation to pay the $300,000 and (ii) the Company's obligations to deliver the

Initials Cuentas _____          Page 1          Initials Rozgold _____

Securities purchased at such Closing, in each case, have been satisfied or waived, but in no event later than the third Trading Day following the date hereof.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 4(a).

"Securities" means the Shares, the Warrants and the Warrant Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" means the shares of Common Stock issued or issuable to the Buyer pursuant to this Agreement.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB, OTCQX, or OTC Pink (or any successors to any of the foregoing).

"Transaction Documents" means this Agreement, the Warrants, all exhibits and schedules thereto and hereto and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Buyer at each Closing in accordance with Section 2(a) hereof, which Warrants shall be exercisable immediately and have a term of exercise equal to five (5) years, in the form of Exhibit A attached hereto.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

b.      Closing. On the Closing Date, upon the terms and subject to the conditions set forth herein, substantially concurrent with the execution and delivery of this Agreement by the parties hereto, the Company agrees to sell, and the Buyer agrees to purchase, 100,000 Shares and a Warrant for 100,000 Warrant Shares. The Buyer shall deliver to the Company, via wire transfer or a certified check, $300,000.00 in immediately available funds (for a purchase price of $3.00 per Share) and the Company shall deliver to the Buyer the Shares and a Warrant, as determined pursuant to Section 2(a), and the Company and the Buyer shall deliver the other items set forth in Section 2(b) deliverable at the Closing. Upon satisfaction of the covenants and conditions set forth in Sections 2(b), 2(c), and 2(d), the Closing shall take place remotely via the exchange of documents and signatures at such time and place as the Company and the Buyer mutually agree upon orally or in writing.

Initials Cuentas __A.M__ Page 2          Initials Rozgold _____

## 2. CLOSING

a.     On or prior to each Closing Date, the Company shall deliver or cause to be delivered to the Buyer the following:

(i)     as to the Closing, this Agreement duly executed by the Company;

(ii)    as to the Closing, stock certificate(s) for 100,000 Shares;

(iii)   as to the Closing, a Warrant registered in the name of the Buyer to purchase 100,000 Warrant Shares, with an exercise price equal to $3.00, subject to adjustment therein;

b.     On or prior to each Closing Date, the Buyer shall deliver or cause to be delivered to the Company the following:

(i)     as to the Closing, this Agreement duly executed by the Buyer;

(ii)    as to the Closing, via wire transfer or a certified check, $300,000 in immediately available funds; and

c.     The obligations of the Company hereunder in connection with each Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects (or, to the extent representations or warranties are qualified by materiality or Material Adverse Effect, in all respects) on the applicable Closing Date of the representations and warranties of the Buyer contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

(ii)    all obligations, covenants and agreements of the Buyer required to be performed at or prior to the applicable Closing Date shall have been performed; and

(iii)   the delivery by the Buyer of the items set forth in Section 2(b) of this Agreement.

d.     The obligations of the Buyer hereunder in connection with each Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects (or, to the extent representations or warranties are qualified by materiality or Material Adverse Effect, in all

Initials Cuentas _____ **A.M**          Page 3          Initials Rozgold _____

respects) when made and on the applicable Closing Date of the representations and warranties of the Company contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

(ii)     all obligations, covenants and agreements of the Company required to be performed at or prior to the applicable Closing Date shall have been performed;

(iii)    the delivery by the Company of the items set forth in Section 2(a) of this Agreement;

(iv)    there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)     from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market, and, at any time prior to the applicable Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of such Buyer, makes it impracticable or inadvisable to purchase the Securities at the Closing.

3.   REPRESENTATIONS AND WARRANTIES OF THE BUYER. The Buyer represents and warrants to the Company that:

a.   Organization formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation with full right, corporate, partnership, limited liability company or similar power and authority to enter into and to consummate the transactions contemplated hereby hereunder. The execution and delivery of this Agreement and performance by such Purchaser of the transactions contemplated hereby have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of Buyer. This Agreement has been duly executed by Buyer, and when delivered by Buyer in accordance with the terms hereof, will constitute the valid and legally binding obligation of Buyer, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited

by applicable law.

b. <u>Own Account</u> been registered under the Securities Act or any applicable state securities law and is acquiring the Shares as principal for its own account and not with a view to or for distributing or reselling such Shares or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Shares in violation of the Securities Act or any applicable state securities law and has

no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Shares in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting the Buyer's right to sell the Shares pursuant to the a registration statement or otherwise in compliance with applicable federal and state securities laws).  Buyer is acquiring the Shares hereunder in the ordinary course of its business.

c. <u>Accredited</u> Rule 501(a) of Regulation D promulgated pursuant to the 1933 Act (an "Accredited Investor").

d. <u>Information</u> relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Shares. The Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company.   To the extent the Buyer has any material nonpublic information, the Company will disclose to the public any and all such information with the filing of its Quarterly Report on Form 10-Q for the period ended September 30, 2018. After the date hereof, the Company will not disclose to the Buyer any material nonpublic information and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer. Neither such inquiries nor any  other  due diligence investigation conducted by Buyer or any of its advisors or representatives shall modify, amend or affect Buyer's right to rely on the Company's representations and warranties contained in Section 4 below.  The Buyer understands that its investment in the Shares involves a significant degree of risk. The Buyer is not aware of any facts that may constitute a breach of any of the Company's representations and warranties made herein.

### 4.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY.
The Company represents and warrants to the Buyer that:

a. <u>Organization</u> this Section 4(a)), if any, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted.   The Company and each of its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its

Initials Cuentas **A.M** Page 5      Initials Rozgold

ownership or use of property or the nature of the business conducted by it makes such qualification necessary except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. "Material Adverse Effect" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith. "Subsidiaries" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest.

The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification. "Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened. If the Company has no subsidiaries, all other references to the Subsidiaries shall be disregarded.

b. _Authorization_ authority to enter into and perform this Agreement, and to consummate the transactions contemplated hereby and to issue the Shares, in accordance with the terms hereof, (ii) the execution and delivery of this Agreement, the Shares by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by the Company's Board of Directors and no further action is required by the Company, the Company's Board of Directors or the Company's stockholders in connection herewith or therewith (iii) this Agreement has been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and bind the Company accordingly, and (iv) this Agreement upon execution and delivery by the Company will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

c. _No Conflicts_. The execution, delivery and performance of this Agreement and the consummation by the Company of the transactions contemplated hereby will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii)   result in a violation of any law, rule,

Initials Cuentas _____          Page 6            Initials Rozgold _____

# A.M

regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect). Neither the Company nor any of its Subsidiaries is in violation of its Certificate of Incorporation, By-laws or other organizational documents and neither the Company nor any of its Subsidiaries is in default (and no event has occurred which with notice or lapse of time or both could put the Company or any of its Subsidiaries in default) under, and neither the Company nor any of its Subsidiaries has taken any action or failed to take any action that would give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or

instrument to which the Company or any of its Subsidiaries is a party or by which any property or assets of the Company or any of its Subsidiaries is bound or affected, except for possible defaults as would not, individually or in the aggregate, have a Material Adverse Effect. The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Shares in violation of any law, ordinance or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the Securities Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency, regulatory agency, self-regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of its obligations under this Agreement, in accordance with the terms hereof or to issue and sell the Shares in accordance with the terms hereof. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof.

d. **Issuance of Shares.** The issuance of the Shares is duly authorized and, upon issuance in accordance with the terms of this Agreement, will be validly issued, fully paid and non-assessable and free from all preemptive or similar rights, taxes, liens, charges and other encumbrances with respect to the issue thereof.

e. **Capitalization.** The capitalization of the Company is as set forth on Schedule 4(e), which Schedule 4(e) shall also include, to the Company's knowledge, the number of shares of Common Stock owned beneficially, and of record, by Affiliates (as defined below) of the Company as of the date hereof. The Company has not issued any capital stock since its most recently filed periodic report under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), other than as reflected in Schedule 4(e) or pursuant to the exercise of employee stock options under the Company's stock option plans, the issuance of shares of Common Stock to employees pursuant to the Company's employee stock purchase plans and pursuant to the conversion and/or exercise of any securities of the Company or the Subsidiaries

Initials Cuentas _A.M_   Page 7     Initials Rozgold _____

which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, right, option, warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock ("Common Stock Equivalents") outstanding as of the date of the most recently filed periodic report under the Exchange Act.  No individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind (hereinafter "Person"), has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated hereby.  Except as a result of the purchase and sale of the Shares or as set forth in <u>Schedule 4(e)</u>, there are no outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire any shares of Common Stock or the capital stock of any Subsidiary, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents or capital stock of any Subsidiary.  The issuance

and sale of the Shares will not obligate the Company or any Subsidiary to issue shares of Common Stock or other securities to any Person and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. There are no outstanding securities or instruments of the Company or any Subsidiary that contain any mandatory redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to redeem a security of the Company or such Subsidiary. The Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. All of the outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities.   No further approval or authorization of any stockholder, the Board of Directors or others is required for the issuance and sale of the Shares.  There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders. For purposes of this Agreement, "Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

     f.    <u>SEC Documents; Financial Statements</u>. With the exception of its Quarterly Report on Form 10-Q for the period ended September 30, 2018, the Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Company was required

by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") (other than is obvious from the dates of the EDGAR filings) on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The Company has   been an issuer subject to Rule 144(i) under the Securities Act. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the SEC with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

g.      Material Changes; Undisclosed Events, Liabilities or Developments. Since the date of the latest audited financial statements included within the SEC Reports (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information. No event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to the Company or its Subsidiaries or their respective businesses, prospects, properties, operations, assets or financial condition, that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

h.      Absence of Litigation. There is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or

Initials Cuentas ___ **A.M** Page 9        Initials Rozgold ____

affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of this Agreement or the Shares or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect. Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

i. <u>Labor Relations</u>. No labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company, which could reasonably be expected to result in a Material Adverse Effect. None of the Company's or its Subsidiaries' employees is a member of a union that relates to such employee's relationship with the Company or such Subsidiary, and neither the Company nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company and its Subsidiaries believe that their relationships with their employees are good. To the knowledge of the Company, no executive officer of the Company or any Subsidiary, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any third party, and the continued employment of each such executive officer does not subject

the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

j. <u>Compliance</u>. Neither the Company nor any Subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree or order of any court, arbitrator or other governmental authority or (iii) is or has been in violation of any statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters, except in each case as

could not have or reasonably be expected to result in a Material Adverse Effect.

k.      Environmental Laws.  The Company and its Subsidiaries (i) are in compliance with all federal, state, local and foreign laws relating to pollution or protection of human health or the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), including laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands, or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations, issued, entered, promulgated or approved thereunder ("Environmental Laws"); (ii) have received all permits licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses; and (iii) are in compliance with all terms and conditions of any such permit, license or approval where in each clause (i), (ii) and (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

l.      Regulatory Permits.  The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the SEC Reports, except where the failure to possess such permits could not reasonably be expected to result in a Material Adverse Effect ("Material Permits"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

m.      Title to Assets.  The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them and good and marketable title in all personal property owned by them that is material to the business of the Company and the

Subsidiaries, in each case free and clear of all liens, except for (i) liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and (ii) liens for the payment of federal, state or other taxes, for which appropriate reserves have been made therefor in accordance with GAAP and, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

n.      Intellectual Property.  The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or required for use in connection with their respective businesses as described in the SEC Reports and which the failure to so have could have a Material Adverse Effect (collectively, the "Intellectual Property Rights").  None of, and neither the Company nor

Initials Cuentas __A.M__ Page 11     Initials Rozgold _____

any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement. Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person, except as could not have or reasonably be expected to not have a Material Adverse Effect. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

m.     No Materially Adverse Contracts, Etc.   Neither the Company nor any of its Subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's officers has or is expected in the future to have a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is a party to any contract or agreement which in the judgment of the Company's officers has or is expected to have a Material Adverse Effect.

n.     Tax Status.   The Company and each of its Subsidiaries has made or filed all federal, state and foreign income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that the Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) and has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim. The Company has not executed a waiver with respect to the statute of limitations relating to the assessment or collection of any foreign, federal, state or local tax. None of the Company's tax returns is presently being audited by any taxing authority.

o.     Certain Transactions.   Except for arm's length transactions pursuant to which the Company or any of its Subsidiaries makes payments in the ordinary course of business upon terms no less favorable than the Company or any of its Subsidiaries could obtain from third parties, none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

Initials Cuentas **A.M**     Page 12     Initials Rozgold _____

p.      Disclosure.  All information relating to or concerning the Company or any of its Subsidiaries set forth in this Agreement and provided to the Buyer and otherwise in connection with the transactions contemplated hereby is true and correct in all material respects and the Company has not omitted to state any material fact necessary in order to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading.  No event or circumstance has occurred or exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

q.      Acknowledgment Regarding Buyer' Purchase of Shares.      The Company acknowledges and agrees that the Buyer is acting solely in the capacity of arm's length purchasers with respect to this Agreement and the transactions contemplated hereby.     The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any statement made by the Buyer or any of its respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation and is merely incidental to the Buyer' purchase of the Shares.  The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the Company and its representatives.

r.      No Brokers.  The Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

s.      Internal Accounting Controls.  Except as disclosed in the SEC Reports the Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company's Board of Directors, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

t.      Foreign Corrupt Practices.  Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or

Initials Cuentas  **A.M**  Page 13            Initials Rozgold ___

domestic government official or employee.

u.    <u>No Investment Company</u>. The Company is not, and upon the issuance and sale of the Shares as contemplated by this Agreement will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "Investment Company"). The Company is not controlled by an Investment Company.

v.    <u>Insurance</u>. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect. Upon written request the Company will provide to the Buyer true and correct copies of all policies relating to directors' and officers' liability coverage, errors and omissions coverage, and commercial general liability coverage.

w.    <u>Bad Actor</u>. No officer or director of the Company would be disqualified under Rule 506(d) of the Securities Act as amended on the basis of being a "bad actor" as that term is established in the September 19, 2013 Small Entity Compliance Guide published by the Commission.

x.    <u>Solvency</u>. Based on the consolidated financial condition of the Company as of the Closing Date, after giving effect to the receipt by the Company of the proceeds from the sale of the Shares hereunder (i) the fair saleable value of the Company's assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature, (ii) the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, consolidated and projected capital requirements and capital availability thereof, and (iii) the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid. The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt). The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction

within one year from the Closing Date. For the purposes of this Agreement, "Indebtedness" means (x) any liabilities for borrowed money or amounts owed in excess of $50,000 (other than trade accounts payable incurred in the ordinary course of business), (y) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's consolidated balance sheet (or the notes

thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (z) the present value of any lease payments in excess of $50,000 due under leases required to be capitalized in accordance with GAAP. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

y. **No-Off Balance Sheet Arrangements**. There is no transaction, arrangement, or other relationship between the Company or any of its Subsidiaries and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed or that otherwise could be reasonably likely to have a Material Adverse Effect.

z. **Manipulation of Price**. The Company has not, and to its knowledge no one acting on its behalf has: (i) taken, directly or indirectly, any action designed to cause or to result, or that could reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

aa. **Sarbanes-Oxley Act**. The Company and each Subsidiary is in material compliance with all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date hereof, subject to certain material weaknesses in internal control over financial reporting as described in the Company's Quarterly Report on Form 10-Q for the period ended March 31, 2018 and all applicable rules and regulations promulgated by the Commission thereunder that are effective as of the date hereof. The Company and the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company and the Subsidiaries have established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and the Subsidiaries and designed such disclosure controls and procedures to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The Company's certifying officers have evaluated the effectiveness of the disclosure controls and procedures of the Company and the Subsidiaries as of the end of the period covered by the most recently filed periodic report under the Exchange Act (such date, the "Evaluation Date"). The Company presented in its most

recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of the disclosure controls and procedures based on their evaluations as of

Initials Cuentas _____ A.M      Page 15      Initials Rozgold _____

the Evaluation Date. Since the Evaluation Date, there have been no changes in the internal control over financial reporting (as such term is defined in the Exchange Act) of the Company and its Subsidiaries that have materially affected, or is reasonably likely to materially affect, the internal control over financial reporting of the Company and its Subsidiaries.

bb.     <u>Employee Relations</u>. Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or employs any member of a union. The Company believes that its and its Subsidiaries' relations with their respective employees are good. No executive officer (as defined in Rule 501(f) promulgated under the Securities Act) or other key employee of the Company or any of its Subsidiaries has notified the Company or any such Subsidiary that such officer intends to leave the Company or any such Subsidiary or otherwise terminate such officer's employment with the Company or any such Subsidiary. To the knowledge of the Company, no executive officer or other key employee of the Company or any of its Subsidiaries is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement, non-competition agreement, or any other contract or agreement or any restrictive covenant, and the continued employment of each such executive officer or other key employee (as the case may be) does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in compliance with all federal, state, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours, except where failure to be in compliance would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

cc.     <u>No Integrated Offering</u>. Neither the Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Shares to be integrated with prior offerings by the Company for purposes of (i) the Securities Act which would require the registration of any such securities under the Securities Act, or (ii) any applicable shareholder approval provisions of any Trading Market on which any of the securities of the Company are listed or designated.

dd.     <u>No Disagreements with Accountants and Lawyers</u>. There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company and the Company is current with respect to any fees owed to its accountants and lawyers which could affect the Company's ability to perform any of its obligations under the Agreement.

ff.     <u>Regulation M Compliance</u>. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company.

5. OTHER AGREEMENTS AND COVENANTS OF THE PARTIES.

a.      Right of Participation.

(i)      From the date hereof until the date that is the 24th month anniversary of the Second Closing Date, upon any issuance by the Company or any of its Subsidiaries of Common Stock or Common Stock Equivalents for cash consideration, Indebtedness or a combination of units thereof (a "Subsequent Financing"), Buyer shall have the right to participate in up to an amount of the Subsequent Financing equal to 100% of the current investment or pro-rata ownership in the company (the "Participation Maximum") on the same terms, conditions and price provided for in the Subsequent Financing.

(ii)      At least five (5) Trading Days prior to the closing of the Subsequent Financing, the Company shall deliver to Buyer a written notice of its intention to effect a Subsequent Financing ("Pre-Notice"), which Pre-Notice shall ask Buyer if it wants to review the details of such financing (such additional notice, a "Subsequent Financing Notice"). The Subsequent Financing Notice shall describe in reasonable detail the proposed terms of such Subsequent Financing, the amount of proceeds intended to be raised thereunder and the Person or Persons through or with whom such Subsequent Financing is proposed to be effected and shall include a term sheet or similar document relating thereto as an attachment.

(iii)      If the Buyer desires to participate in such Subsequent Financing Buyer must provide written notice to the Company by not later than 5:30 p.m. (New York City time) on the fifth (5th) Trading Day after having received the Pre-Notice, the amount of Buyer's participation, and representing and warranting that Buyer has such funds ready, willing, and available for investment on the terms set forth in the Subsequent Financing Notice. If the Company receives no such notice from Buyer as of such fifth (5th) Trading Day, Buyer shall be deemed to have notified the Company that it does not elect to participate.

Notwithstanding the foregoing, if the five days notice is not given or if any notices are not given, then the buyer could exercise its right of participation for a period of five days after the closing of the sale of such subsequent offering on the same terms set forth above.

b.      Financial Information.   The Company agrees to send or make available the following reports to the Buyer until the Buyer transfers, assigns, or sells all of the Shares: within ten (10) calendar days after the filing with the SEC, a copy of its Annual Report on Form 10-K, its Quarterly Reports on Form 10-Q and any Current Reports on Form 8-K; within one (1) day after release, copies of all press releases issued by the Company or any of its Subsidiaries; and contemporaneously with the making available or giving to the shareholders of the Company, copies of any notices or other information the Company makes available or gives to such shareholders. For the avoidance of doubt, filing the documents required in (i) above via EDGAR or releasing any documents set forth in (ii) above via a recognized wire service shall satisfy the delivery requirements of this Section 5.

c.      Corporate Existence.   So long as the Buyer beneficially owns any Shares, the Company shall maintain its corporate existence and shall not sell all or substantially all of the

Initials Cuentas __**A.M**__ Page 17          Initials Rozgold _____

Company's assets, except in the event of a merger or consolidation or sale of all or substantially

all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith and (ii) is a publicly traded corporation whose Common Stock is listed for trading on the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB OTCQX, or OTC Pink (or any successors to any of the foregoing).

d.      <u>Failure to Comply with the Exchange Act</u>.  So long as the Buyer beneficially owns any Shares, the Company shall comply with the quarterly and annual reporting requirements of the Exchange Act; and the Company shall continue to be subject to the reporting requirements of the Exchange Act.

e.      <u>No Integration</u>.  The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Exchange Act) that would be integrated with the offer or sale of the Shares for purposes of the rules and regulations of Nasdaq such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

f.      <u>Trading Activities</u>.  Neither the Buyer nor its affiliates has an open short position (or other hedging or similar transactions) in the Common Stock of the Company and the Buyer agree that it shall not, and that it will cause its affiliates not to, engage in any short sales of or hedging transactions with respect to the Common Stock of the Company.

g.      <u>Dilutive Issuance</u>.  Until such time as Buyer no longer holds any Shares, if the Company shall issue any Common Stock or Common Stock Equivalents, except for Excepted Issuances, for an effective consideration that is less than the $3.00 per share of Common Stock that is issued or issuable (the "Lower Offering Price"), then at such time, and thereafter successively upon each such issuance, Buyer shall receive additional shares of Common Stock (the "Additional Shares") in the amount by which (x) the Purchase Price divided by the Lower Offering Price exceeds (y) the number of Shares issued pursuant to this Agreement. For purposes of this adjustment, the issuance of any security or debt instrument of the Company carrying the right to convert such security or debt instrument into Common Stock or of any warrant to purchase Common Stock shall result in an issuance of Additional Shares upon the issuance of the of the above-described security, debt instrument, warrant, right, or option if such security or debt instrument may be converted or exercised at a price lower than $3.00 Common Stock issued or issuable by the Company for no consideration will be deemed issuable or to have been issued for $0.001 per share of Common Stock. If the issuance of the Additional Shares would result in the Buyer's beneficial ownership of the Company's common stock exceeding 4.99% of the amount of the Company's issued and outstanding common stock at such time, then the Company shall issue to the Buyer a reduced number of Additional Shares, such that the issuance of such Additional Shares would result in the Buyer beneficially owning exactly 4.99% of the Company's issued and outstanding common stock at such time.  At any time that the Buyer has

Initials Cuentas  A.M      Page 18          Initials Rozgold _____

been issued fewer than all of Additional Shares pursuant to the foregoing, the Company will issue to Buyer any such Additional Shares that have not been issued upon receipt of written

notice from the Buyer requesting such issuance and stating that (i) the issuance of such Additional Shares would not result in the Buyer's beneficial ownership of the Company's common stock exceeding 4.99% of the amount of the Company's issued and outstanding common stock at such time or (ii) the issuance of such Additional Shares will be made 61 days from the date of such notice.

h.    Piggy Back Registration Rights. If while any of the Shares are outstanding, there is not an effective registration statement covering all of the Shares and the Company shall determine to prepare and file with the SEC a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with the Company's stock option or other employee benefit plans, then the Company shall deliver to Buyer a written notice of such determination and, if within fifteen days after the date of the delivery of such notice, Buyer shall so request in writing, the Company shall include in such registration statement all of the Shares Buyer requests to be registered.

i.    Transfer Restrictions.

(i) The Shares may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of Shares other than pursuant to an effective registration statement or Rule 144, to the Company or to an Affiliate of Buyer or in connection with a pledge as contemplated herein, the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and shall have the rights and obligations of Buyer under this Agreement.

(ii) Buyer agrees to the imprinting, so long as is required by the terms hereof, of a legend on the Shares in the following or similar form:

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH

APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Company acknowledges and agrees that Buyer may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or

all of the Shares to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and, if required under the terms of such arrangement, Buyer may transfer pledged or secured Shares to the pledgees or secured parties. Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith. Further, no notice shall be required of such pledge. At Buyers expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Shares may reasonably request in connection with a pledge or transfer of the Shares.

(iii)     Certificates evidencing the Shares shall not contain any legend (including the legend set forth above): (i) while a registration statement covering the resale of such security is effective under the Securities Act, (ii) following any sale of such Shares pursuant to Rule 144, or (iii) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the SEC). At the Company's expense, the Company shall cause its counsel to issue a legal opinion to its Transfer Agent or the Buyer if required by the Transfer Agent to effect the removal of the legend hereunder, or if requested by Buyer, respectively (including with respect to any sales by Buyer pursuant to Rule 144). The Company agrees that following such time as such restrictive stock legend is no longer required, it will, no later than the earlier of (i) two (2) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period (as defined below) following the delivery by Buyer to the Company or the Company's Transfer Agent of a certificate representing Shares, as applicable, issued with a restrictive legend (such date, the "Legend Removal Date"), deliver or cause to be delivered to Buyer a certificate representing such shares that is free from all restrictive and other legends. The Company may not make any notation on its records or give instructions its Transfer Agent that enlarge the restrictions on transfer set forth herein. Certificates for Shares subject to legend removal hereunder shall be transmitted by the Transfer Agent to Buyer by crediting the account of the Buyer's prime broker with the Depository Trust Company System as directed by Buyer. As used herein, "Standard Settlement Period" means the standard settlement period, expressed in a number of Trading Days, on the Company's primary trading market with respect to the Common Stock as in effect on the date of delivery of a certificate representing the Shares, as applicable, issued with a restrictive legend.

j.     Most Favored Nation Provision. From the date hereof until the date when the Buyer no longer holds any Shares, if the Company effects a Subsequent Financing, the Buyer may elect, in its sole discretion, to exchange (in lieu of cash subscription payments), if

Initials Cuentas _____ **A.M** Page 20          Initials Rozgold _____

applicable, all or some of the Shares then held for any securities or units issued in a Subsequent Financing on a $1.00 for $1.00 basis; provided, however, that this Section 5(j) shall not apply with respect to an Exempt Issuance.  The Company shall provide the Buyer with notice of any such Subsequent Financing in the manner set forth in Section 5(a).   For purposes of illustration, if a Subsequent Financing were to occur whereby the Company sells and issues a convertible note with a conversion price that includes a discount to the market price of its Common Stock, the Buyer will be entitled to receive the same convertible note on the exact same terms on a dollar for dollar basis via the exchange of the Shares the Buyer holds on the date of the sale and issuance of the convertible note (meaning the convertible note would be issued to the Buyer for a

principal amount equal to the number of Shares to be exchanged by Buyer multiplied by 3). By way of example only, if the Company sells and issues a convertible note (the "Sale Date") and the Buyer holds 10,000 of the Shares purchased pursuant to the Closing (i.e., 50% of the Shares purchased pursuant to the Closing) on the Sale Date, the Buyer shall exchange the 10,000 Shares for a convertible note with a principal amount of $30,000 (i.e., 50% of the purchase price of the Shares purchased pursuant to the Closing).

k.     Remedies. If the Company is (i) not current in its reporting obligations under the Exchange Act within 30 days of the date hereof or (ii) becomes current in its reporting obligations under the Exchange Act within 30 days but subsequently becomes delinquent in its reporting obligations under the Exchange Act thereafter, the Buyer may at any time and from time to time after such occurrence,   deliver a put notice (the "Put Notice"), unless such delinquencies in its reporting obligations are cured prior to receiving a Put Notice, to the Company whereby the Company must purchase from the Buyer the number of shares of Common Stock comprising the Put Amount within two (2) Trading Days of the Put Notice delivery date (the "Put Notice Date") to the Company at $3.60 per share, subject to adjustment for reclassification of the Common Stock. The "Put Notice Date" shall mean the Trading Day on which the Put Notice is delivered to the Company. The "Put Amount" shall mean the total dollar amount requested by the Buyer pursuant to an applicable Put Notice. The timing and amounts of each Put Notice shall be at the discretion of the Buyer.

l.     Adjustments. It is the intention of the Company and the Buyer that the Buyer shall be able to sell (if Buyer so elects, in Buyer's sole and absolute discretion) the Shares, and generate net proceeds (net of all brokerage commissions and other fees or charges payable by Buyer in connection with the sale thereof) from such sale equal to $3.60 per Share, subject to adjustment for reclassification of the Common Stock. The Buyer shall have the right (but not an obligation) to sell the Shares in the principal Trading Market or otherwise, at any time in accordance with applicable securities laws. At any time the Buyer may elect, the Buyer may deliver to the Company a reconciliation statement showing the net proceeds actually received by the Company from the sale of the Shares (the "Sale Reconciliation"). If, as of the date of the delivery by Buyer of the Sale Reconciliation, the Buyer has not realized net proceeds from the sale of such Shares equal to at least $3.60 per Share, subject to adjustment for reclassification of

Initials Cuentas _____ **A.M** Page 21          Initials Rozgold _____

the Common Stock, as shown on the Sale Reconciliation, then the Company shall immediately take all required action necessary or required in order to cause the issuance of additional shares of Common Stock to the Buyer in an amount sufficient such that, when sold and the net proceeds thereof are added to the net proceeds from the sale of any of the previously issued and sold Shares, the Buyer shall have received total net funds equal to $3.60 per Share, subject to adjustment for reclassification of the Common Stock.  If additional shares of Common Stock are issued pursuant to the immediately preceding sentence, and after the sale of such additional issued shares of Common Stock, the Buyer still has not received net proceeds equal to at least $3.60 per Share, subject to adjustment for reclassification of the Common Stock, then the Company shall again be required to immediately take all required action necessary or required in order to cause the issuance of additional shares of Common Stock to the Buyer as contemplated above, and such additional issuances shall continue until the Buyer has received net proceeds from the sale of such Common Stock equal to $3.60 per Share.  In the event additional Common Stock is required to be issued as outlined above, the Company shall instruct its transfer agent to issue

certificates representing such additional shares of Common Stock to the Buyer immediately subsequent to the Buyer's notification to the Company that additional shares of Common Stock are issuable hereunder, and the Company shall in any event cause its transfer agent to deliver such certificates to Buyer within three (3) Business Days following the date Buyer notifies the Company that additional shares of Common Stock are to be issued hereunder.  In the event such certificates representing such additional shares of Common Stock issuable hereunder shall not be delivered to the Buyer within said three (3) Business Day period, same shall be an immediate default under this Agreement and the Transaction Documents

6. Governing Law; Miscellaneous

a.      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Jurisdiction to be Miami-Dade County.   Any action brought by either party against the other concerning the transactions contemplated by this Agreement, or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts of New Jersey or in the federal courts located in the District of the State of New Jersey. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and

shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER  OR UNDER ANY OTHER TRANSACTION DOCUMENT OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is

invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.    Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other transaction document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b.      Counterparts; Signatures by Facsimile.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.  This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

c.      Construction; Headings.  This Agreement shall be deemed to be jointly drafted by

the Company and the Buyer and shall not be construed against any person as the drafter hereof. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

d.      Severability.  In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

e.      Entire Agreement; Amendments.  This Agreement, the Note and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.  No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the majority in interest of the Buyer.

f.      Notices.    All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, email, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by email or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number

agreements and covenants set forth in this Agreement shall survive Closing hereunder not withstanding any due diligence investigation conducted by or on behalf of the Buyer. The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

j.      Further Assurances.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

k.      No Strict Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

l.      Replacement of Securities. If any certificate or instrument evidencing any Shares is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Shares.

m.      Remedies.  The Company acknowledges that a breach by it of its obligations

hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

n.      Publicity. The Company, and the Buyer shall have the right to review a reasonable period of time before issuance of any press releases, Commission, or FINRA filings, or any other public statements with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled, without the prior approval of the Buyer, to make any press release or Commission, or FINRA filings with respect to such transactions as is required by applicable law and regulations (although the Buyer shall be consulted by the Company in connection with any such press release prior to its release and shall be provided with a copy thereof and be given an opportunity to comment thereon).

Initials Cuentas ___**A.M**___ Page 25          Initials Rozgold ___

o.      **Indemnification.**  In consideration of the Buyer's execution and delivery of this Agreement and acquiring the Shares hereunder, and in addition to all of the Company's other obligations under this Agreement, the Company shall defend, protect, indemnify and hold harmless the Buyer and its stockholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Shares, or (iii) the status of the Buyer or holder of the Shares as an investor in the Company pursuant to the transactions contemplated by this Agreement. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities that is permissible under applicable law.

[signature page follows]

Initials Cuentas _A.M_   Page 26          Initials Rozgold _____

<u>Schedule 4(e)</u>

Capitalization

A.M

Initials Rozgold



# WIRE BREAKDOWN

1. 1/7/19 : Wire In - $50K

2. 12/10/18: Wire In - $141K

3. 12/4/18: Wire In - 107K

| Date ↓ | Description | Type | Status | Amount | Available Balance |
|---|---|---|---|---|---|
| Showing results for "rozgold" | | | | | [Show all transactions] |
| 01/07/2019 | WIRE TYPE:WIRE IN DATE: 190107 TIME:1500 ET TRN:2019010700436065... | ⊕ | C | 50,000.00 | |
| 12/10/2018 | WIRE TYPE:WIRE IN DATE: 181210 TIME:1651 ET TRN:2018121000485924... | ⊕ | C | 141,000.00 | |
| 12/04/2018 | WIRE TYPE:WIRE IN DATE: 181204 TIME:1720 ET TRN:2018120400499927... | ⊕ | C | 107,000.00 | |
| ▸ Icon legend | | | | | |

| Date ↓ | Description | Type | Status | Amount | Available Balance |
|---|---|---|---|---|---|
| Showing results for "rozgold" | | | | [Show all transactions] | |
| 01/07/2019 | WIRE TYPE:WIRE IN DATE: 190107 TIME:1500 ET TRN:2019010700436065... | ⊕ | [C] | 50,000.00 | |
| 12/10/2018 | WIRE TYPE:WIRE IN DATE: 181210 TIME:1651 ET TRN:2018121100048592A... | ⊕ | [C] | 141,000.00 | |
| 12/04/2018 | WIRE TYPE:WIRE IN DATE: 181204 TIME:1720 ET TRN:2018120400459927... | ⊕ | [C] | 107,000.00 | |

▶ Icon legend

**Olde Monmouth Stock Transfer**

200 Memorial Parkway, Atlantic Highlands, NJ 07716  732-872-2727  transferagent@oldemonmouth.com

08/28/2019
1:34 pm
Page 13 of 17

**1322 - Cuentas, Inc.**

**Shareholders with Certificate Detail**

Active Certificates Class CS3 through 08/28/19

| Name/Address | Shares | Certificate | | | Issued | Active Shares | |
|---|---|---|---|---|---|---|---|
| Roxgold Capital LLC | | | | | | | |
| 3916 Greenwood St | | | | | | | |
| Newbury Park, CA 91320 | | | | | | | |
| | 35,667 | BE3- | 2007 | BkEntry | 12/10/18 | 35,667 | Restricted |
| | 47,000 | BE3- | 2009 | BkEntry | 12/13/18 | 47,000 | Restricted |
| | 16,667 | CS3- | 2022 | | 01/31/19 | 16,667 | Restricted |
| | | Total Active Shares for Stock Class CS3 | | | | 99,334 | |
| | | | Total Restricted Shares: | | | 99,334 | |



# TRANSFER OF SHARES

## SHARE CERTIFICATES MUST BE DELIVERED IN NEGOTIABLE FORM IN ORDER TO EFFECT TRANSFER

### * ENDORSE BACK OF CERTIFICATE

* (Stock Power May Be Substituted For Endorsement on Certificate)

* (If Joint Registration, Both Parties Must Sign)

* (If Corporation, Include a Corporate Resolution)

### * HAVE SIGNATURE "MEDALLION GUARANTEED"

* (Medallion can be obtained from a commercial bank or brokerage firm)

### * LETTER OF INSTRUCTION AS TO HOW THE SHARES ARE TO BE REGISTERED INCLUDING THE FOLLOWING ITEMS:

* Registration Name  * Mailing Address  * Tax Identification Number

* Telephone Number  * E-Mail Address  * Delivery Instructions

### * SEND ORIGINAL CERTIFICATE AND LETTER OF INSTRUCTIONS TO:

Olde Monmouth Stock Transfer Co., Inc.

200 Memorial Parkway

Atlantic Highlands, NJ 07716

### * ENCLOSE TRANSFER FEE OF:

* $25 PER CANCELLED CERTIFICATE

* $125 PER ISSUED CERTIFICATE

*$30 DOMESTIC FEDEX- IF OVERNIGHT DELIVERY IS REQUESTED



# EXHIBIT D

## THE FOLLOWING TEXTS WERE EXCHANGED BETWEEN JAMES HOGG & STEPHEN BRAVERMAN IN 2019.

Synopsis of first text (2) pages on June 24, 2019

1. Plaintiff makes it very clear in his opening text message to the defendant that his rightful shares must be assigned back to him upon him agreeing to ALL. (See highlighted text on page 1 & 2 of text message conversation between Plaintiff (blue) & Defendant (white).

2. Furthermore, Plaintiff pontificates that he is attempting to recoup all that he can due to previous pecuniary losses.

3. Defendant clearly acquiesced and acknowledged that the Plaintiff needed to speak with others in charge and to inform them that he (defendant) will do what was discussed.

4. Plaintiff expresses concern about being cheated or tricked and expresses he has had his share of financial/business dealing misfortunes.

5. Finally, the defendant admits that the plaintiff is not only entitled to the shares and the value monetarily of the shares that he bought, but that the plaintiff actually paid for them.

6. Therefore, this first text is the summation of an honest confession by the defendant and is not just a point of reference but also of merits to the plaintiff's demand.

 Gmail                                      Simon Kogan <simonkoganlaw@gmail.com>

## Text message from Steve

**Troy James** <blackcreekmarketing@yahoo.ca>                           Sun, Jun 7, 2020 at 9:36 AM
To: Simon Kogan <sskoganesq@gmail.com>, Simon Kogan <simonkoganlaw@gmail.com>, Troy James
<blackcreekmarketing@yahoo.ca>

This is a text message from Steve stating that I paid for the stock and that he has given it back to me which is right after
he signed all documents.

 9:34 ⏶                                     



Steve - Crypto ›

Troy you were forced out
because you owed money to
Sion for that ridiculous deal you
and Jamie made with them and
couldn't pay it. You said in the
board meeting in September
that you would pay everything.
You never did. I brought Kent
swig to the table who was
going to put in all the money
needed and all you had to do
was give us a business plan.
And you refused. I was with you
until you insulted my billionaire

investor and board member. I did what I had to do to make it right by the dozens of people who trusted me and invested millions into dig and Arbitrade. So don't talk to me about games. You could have been part of this if you had made better choices

And I told you numerous times that I would personally take care of you if you just cooperated to get these deals done...which again you refused. So don't give me that bullshit

    

9:34 ✈



105



S

Steve - Crypto ›

And you refused. I was with you until you insulted my billionaire investor and board member. I did what I had to do to make it right by the dozens of people who trusted me and invested millions into dig and Arbitrade. So don't talk to me about games. You could have been part of this if you had made better choices

And I told you numerous times that I would personally take care of you if you just cooperated to get these deals done...which again you refused. So don't give me that bullshit that I'm playing games.

I do right by people

Including you

You paid for the NxT

6/7/2020           Gmail - Text message from Steve

**PAGE 4 OF 4**

I gave it back to you

Has Jamie?

Doubt it

  

Sent from Yahoo Mail for iPhone

 Gmail

Simon Kogan <simonkoganlaw@gmail.com>

### Another text from SB

**Troy James** <blackcreekmarketing@yahoo.ca>
To: Simon Kogan <sskoganesq@gmail.com>, Simon Kogan <simonkoganlaw@gmail.com>

Sun, Jun 7, 2020 at 9:54 AM

Another text where Steve says the stock is mine and that I paid for it.

9:53  

 105



Steve - Crypto ›

> Before I agree to all of this I want you to assign my shares that I rightfully paid for back to me. I need to recoup wherever I possibly can

> I understand

What shares?

 NXT

Sure

Talk to those guys

Tell them I will do that

Not to Jamie or anyone else. So fkin tired of getting screwed for huge Money

Ok

Yeah fuck that

You are entitled

You paid for it

  

Sent from Yahoo Mail for iPhone

# SYNOPSIS OF 2ND TEXT CONVERSATION

1.   The  following  text  message conversation features a text message left by defendant on plaintiff's cell phone on July 15, 2019. Defendant left plaintiff a message in the form of a monologue. Plaintiff did not reply.

2. The defendant's proclamations on the last line of page 3 denote awareness and admission that the plaintiff indeed paid  for  and  owned  the  stock  in question that is currently in holding at Olde Monmouth Stock Co. Inc. (See Page 3 )

3. Finally, the defendant follows up with the first sentence on (Page 4) in writing that he gave back ownership the NXT (SHARES) to the plaintiff.



## Synopsis of Email Thread 8/26/19 - 9/10/19

1.(Page 4 of 5 )

**Matthew Schulman VP Compliance of
Cuentas Inc. emailed Jeff English of Old
Monmouth Co. Inc
(Stock Transfer Agent)**

\* The beginning of the email thread dated August 26, 2019 (page 4 of 5), was written by Matthew Schulman VP Compliance at Cuentas Inc. to Jeff English of Olde Monmouth Co. Inc. with copies to officers, bankers and investor plaintiff Troy Hogg.

Announcement from compliance states that Stephen Braverman, James Goldberg, and investor Troy Hogg came to an agreement that the aforementioned 99,334 shares held in the name of Rozgold are to be transferred to the name of Coconut Capital as per the instructions of the defendant, Troy Hogg and James Goldberg. Cuentas Inc. compliance then proceeded to render documents and asked to be informed if the stock transfer needed anything else to make this transaction happen to contact compliance at Cuentas Inc.

2. August 27, 2019 (page 4 of 5), Jeff English VP of Old Monmouth Co. Inc. replied to compliance at Cuentas Inc. In Jeff English's reply to compliance he clearly stated that the previous documents that were presented were insufficient. Jeff English further went on to explain that a medallion guaranteed stock power (original copy) & corporate resolution from Rozgold would be needed to complete the aforementioned transfer. The complete stock transfer instructions were affixed to the email thread. Furthermore, Mathew Schulman VP Compliance Cuentas Inc. offered to help coordinate documents required to complete the process. Furthermore, Jeff English states the physical certificate is needed to transfer the shares.

3. On August 27, 2019, Matthew Schulman VP Compliance email forwards the Olde Monmouth instructions to Stephen Braverman et al. Due to their response and interest in transferring the shares. The instructions were completely detailed what was both necessary and expected to honor the transfer. ( See Exhibit C )

One week later, on September 4, 2019, compliance follows up (page 2 of 5) Matthew Schulman VP Compliance Cuentas Inc. emails Stephen Braverman to follow up regarding previous emails. He reiterates what Jeff English of Olde Monmouth said by copying an excerpt from Jeff English's email into the body as well as including the email thread to previous conversation. Compliance re-states the documentation needed to complete the transfer of shares.

September 5, 2019, Compliance at Cuentas Inc. via Matthew Schulman wrote: (page 1 of 5), addressing Steve, James, Troy:
"I have filled out the Corporate Resolution and Stock Power documents to help get the ball rolling. Attached is also the Olde Monmouth shareholder report from 8/28/19 showing 99,334 shares issued to Rozgold. Please renew the transfer instructions to be sure Olde Monmouth receives what it needs to effect the transfer."

Finally, September 10, 2019 (page 1 of 5), an email from Stephen Braverman to compliance succinctly reads to please call him.

Defendant effected a complete stonewall without explanation to the Plaintiff, the investor herein as to why he has yet to receive his promised just due shares executed by transfer for what was agreed upon originally. which has been noted in both in cell phone text messaging and in corporate email thread. Compliance had successfully verified wired funds had been received and were all set to finalize transfer requirements in honor of agreement.

Refer to (page 6 of 6) Defendant Stephen Braverman of Rozgold Capital fully endorsed his signature on a document permitting the change of his certificates shares to the name of Plaintiff, Troy James Hogg or any other name that Mr. Hogg would choose. Albeit, defendant in seemingly deliberate fashion omits the date of the document and the medallion guarantee. As promised, the defendant fails to impress at execution of duties previously agreed to. Defendant failed to transfer the shares as promised and craftily and strategically does so by excluding pertinently vital information. Thus, precipitating a calculating stalemate for all parties.

## Synopsis of Exhibit E

Index Of Persons/Titles

Source: Reuters & SEC

ARIK MAIMON – CHAIRMAN OF BOARD/CEO – CUENTAS INC.

MATTHEW SCHULMAN – VP COMPLIANCE CUENTAS INC.

MICHAEL DE PRADO – PRESIDENT/DIRECTOR CUENTAS INC.

SYLWIN GRINMAN – CHIEF OPERATING OFFICER CUENTAS INC.

ADIV BARUCH – CHIEF STRATEGY OFFICER/DIRECTOR CUENTAS INC.

RAN DANIEL – CHIEF FINANCIAL OFFICER CUENTAS INC.

KARY BAKER – UNKNOWN FUNCTION – CUENTAS INC.

MATTHEW TROSTER – PRESIDENT OLDE MONMOUTH CO. INC.

JEFF ENGLISH – VP – OLDE MONMOUTH CO. INC.

JAMES GOLDBERG – INVESTMENT/BROKER/BANKER COCONUT CAPITAL

STEPHEN BRAVERMAN – ROZGOLD CAPITAL

TROY HOGG – INVESTOR

 Gmail                                        **Simon Kogan <simonkoganlaw@gmail.com>**

## Fw: [FWD: Re: [FWD: RE: Transfer of Shares from Rozgold to Coconut Capital]]-2019-0910

**james goldberg** <james_goldberg@msn.com>                    Tue, May 12, 2020 at 11:05 AM
To: "simonkoganlaw@gmail.com" <simonkoganlaw@gmail.com>

first email

James Goldberg

Coconut Capital LLC

Cellular: (305) 785-6900 -786-201-1111

Email:James_Goldberg@msn.com

Email:Coconutcapital@gmail.com.     Please Note: The information in this email is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information; please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy. Although this email and any attachments are believed to be free of any virus or other defect that may affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use.

---

**From:** compliance@cuentas.com <compliance@cuentas.com>
**Sent:** Tuesday, May 12, 2020 10:59 AM
**To:** james goldberg <JAMES_GOLDBERG@msn.com>
**Cc:** Michael De Prado <michael@cuentas.com>
**Subject:** [FWD: Re: [FWD: RE: Transfer of Shares from Rozgold to Coconut Capital]]-2019-0910

-------- Original Message --------

> Subject: Re: [FWD: RE: Transfer of Shares from Rozgold to Coconut Capital]
> From: Stephen Braverman <sbraverman22@gmail.com>
> Date: Tue, September 10, 2019 1:13 pm
> To: compliance@cuentas.com
>
> Please call me
>
> Stephen Braverman
> 516-398-4617
>
>
> On Thu, Sep 5, 2019 at 1:06 PM <compliance@cuentas.com> wrote:
>> B"H
>>
>> Steve, James & Troy,
>>
>> I have filled out the Corp Resolution & Stock Power documents to help get the ball rolling.
>>
>> Attached is also the Olde Monmouth shareholder report from 8/28/2019 showing the 99,334 shares issued to Rozgold.
>>
>> Please review the transfer instructions to be sure Olde Monmouth receives what it needs to effect the transfer.

Case 1:20-cv-02862-BMC   Document 1   Filed 06/29/20   Page 81 of 109 PageID #: 81

If you have any questions or comments, please contact me as listed below.

Best Regards,

Matthew
=================
Matthew Schulman - VP Compliance
Cuentas Inc. (OTCQB: CUEN)
19 W. Flagler St.
Suite 902
Miami, Florida 33130
Tel: (786) 229-2222
Email: compliance@cuentas.com
_____

The information in this e-mail is confidential and may be legally privileged. It is intended solely for the
addressee. If you are not the intended recipient please delete. Any views expressed in this message are
those of the individual sender, except where the sender specifically states them to be the views of
Cuentas, Inc.


———— Original Message ————
Subject: [FWD: RE: Transfer of Shares from Rozgold to Coconut Capital]
From: <compliance@cuentas.com>
Date: Wed, September 04, 2019 6:14 pm
To: "Stephen Braverman-Rozgold" <sbraverman22@gmail.com>
Cc: "james goldberg" <JAMES_GOLDBERG@msn.com>, "Troy James"
<blackcreekmarketing@yahoo.ca>, "Ran Daniel-Cuentas" <ran@cuentas.com>,
"Michael De Prado" <michael@cuentas.com>, "Arik Cuentas"
<arik@cuentas.com>, "Sylwin Grinman-Cuentas" <sylwin@cuentas.com>,
"Kary Baker-Cuentas" <kary@cuentas.com>, "Jeff English"
<jeff@oldemonmouth.com>, "Matt Troster" <matt@oldemonmouth.com>

B"H

Steve, James & Troy,

Jeff English, from our transfer agent, Olde Monmouth previously stated what he needed to
complete the transfer of the shares.

Jeff stated:
We need a medallion guaranteed stock power (original copy) and corporate
resolution from Rozgold to transfer their shares.  I've attached transfer
instructions here along with a blank stock power and corporate resolution.  I
have also attached a shareholder statement for Rozgold.

Olde Monmouth holds 2 book-entry positions and we have Rozgold's CUEN
Certificate # 2022 for 16,667 shares.

1- Does this CUEN certificate need to go to Rozgold for signatures or should it
be sent to Olde Monmouth?

Let me know and I will help to coordinate any documents required to complete
this process.

If you have any questions or comments, please contact me as listed below.

Best Regards,

Matthew
=================
Matthew Schulman - VP Compliance

Case 1:20-cv-02862-BMC   Document 1   Filed 06/29/20   Page 82 of 109 PageID #: 82

Cuentas Inc. (OTCQB: CUEN)
19 W. Flagler St.
Suite 902
Miami, Florida 33130
Tel: (786) 229-2222
Email: compliance@cuentas.com
_____
The information in this e-mail is confidential and may be legally privileged. It is intended solely
for the addressee. If you are not the intended recipient please delete. Any views expressed in
this message are those of the individual sender, except where the sender specifically states
them to be the views of Cuentas, Inc.


-------- Original Message --------
Subject: [FWD: RE: Transfer of Shares from Rozgold to Coconut Capital]
From: <compliance@cuentas.com>
Date: Tue, August 27, 2019 5:31 pm
To: "Stephen Braverman-Rozgold" <sbraverman22@gmail.com>
Cc: "james goldberg" <JAMES_GOLDBERG@msn.com>, "Troy James"
<blackcreekmarketing@yahoo.ca>, "Ran Daniel-Cuentas" <ran@cuentas.com>,
"Michael De Prado" <michael@cuentas.com>, "Arik Cuentas"
<arik@cuentas.com>, "Sylwin Grinman-Cuentas" <sylwin@cuentas.com>, "Kary
Baker-Cuentas" <kary@cuentas.com>

B"H

Steve, James & Troy,

Please see Jeff's comments below from Olde Monmouth to complete the transfer of
the shares.

If you have any questions or comments, please contact me as listed below.

Best Regards,

Matthew
================
Matthew Schulman - VP Compliance
Cuentas Inc. (OTCQB: CUEN)
19 W. Flagler St.
Suite 902
Miami, Florida 33130
Tel: (786) 229-2222
Email: compliance@cuentas.com
_____
The information in this e-mail is confidential and may be legally privileged. It is
intended solely for the addressee. If you are not the intended recipient please delete.
Any views expressed in this message are those of the individual sender, except where
the sender specifically states them to be the views of Cuentas, Inc.


-------- Original Message --------
Subject: RE: Transfer of Shares from Rozgold to Coconut Capital
From: Jeff English <jeff@oldemonmouth.com>
Date: Tue, August 27, 2019 3:23 pm
To: "compliance@cuentas.com" <compliance@cuentas.com>
Cc: Arik Cuentas <arik@cuentas.com>, Michael De Prado
<michael@cuentas.com>, Ran Daniel-Cuentas <ran@cuentas.com>, Sylwin
Grinman-Cuentas <sylwin@cuentas.com>, Christine Knudsen
<christine@oldemonmouth.com>

Hi Matthew,

These docs are not sufficient.  We need a medallion guaranteed stock power (original copy) and corporate resolution from Rozgold to transfer their shares.  I've attached transfer instructions here along with a blank stock power and corporate resolution.  I have also attached a shareholder statement for Rozgold.  They hold 2 book-entry positions and 1 physical certificate.  We need the physical certificate to transfer it.  Let me know if you have any additional questions.

Regards,

Jeff English - Vice President
Olde Monmouth Stock Transfer Co., Inc.
200 Memorial Parkway
Atlantic Highlands, NJ  07716
Phone (732) 872-2727, ext 103
Fax (732) 872-2728

DISCLAIMER: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient, you may not review, copy or distribute this message. If you have received this email in error, please notify us immediately and delete the email and any attachments from your system.

**From:** compliance@cuentas.com <compliance@cuentas.com>
**Sent:** Monday, August 26, 2019 4:59 PM
**To:** Jeff English <jeff@oldemonmouth.com>
**Cc:** Arik Cuentas <arik@cuentas.com>; **Michael De Prado** <michael@cuentas.com>; **Ran Daniel-Cuentas** <ran@cuentas.com>; **Sylwin Grinman-Cuentas** <sylwin@cuentas.com>
**Subject:** Transfer of Shares from Rozgold to Coconut Capital

B"H

Jeff,

Rozgold, Coconut Capital and Troy Hogg have come to an agreement whereby the 99,334  shares held in the name of Rozgold are to be transferred to the Name of Coconut Capital as per the instructions of Mr Braverman, Mr. Hogg & Mr Goldberg.

Please advise if these documents are sufficient for you or if you need additional info.  These are all book entrees.

Attached are several documents

If you have any questions or comments, please contact me as listed below.

Best Regards,

Case 1:20-cv-02862-BMC   Document 1   Filed 06/29/20   Page 84 of 109 PageID #: 84

Matthew
=================
Matthew Schulman - VP Compliance
Cuentas Inc. (OTCQB: CUEN)
19 W. Flagler St.
Suite 902
Miami, Florida 33130
Tel: (786) 229-2222
Email: compliance@cuentas.com

---

The information in this e-mail is confidential and may be legally
privileged. It is intended solely for the addressee. If you are not
the intended recipient please delete. Any views expressed in this
message are those of the individual sender, except where the
sender specifically states them to be the views of Cuentas, Inc.

Case 1:20-cv-02862-BMC   Document 1   Filed 06/29/20   Page 85 of 109 PageID #: 85

dba M & M Telecom, dba Tel3 & Next Mobile 360
A Cuentas Company (OTCQB: CUEN)
19 W. Flagler St.
Suite 507
Miami, Florida 33130
Tel: (786) 229-2222
**Email:** compliance@cuentas.com

_____

The information in this e-mail is confidential and may
be legally privileged. It is intended solely for the
addressee. If you are not the intended recipient please
delete. Any views expressed in this message are those
of the individual sender, except where the sender
specifically states them to be the views of Cuentas,
Inc.

-------- Original Message --------
Subject: RE: Cuentas-Rozgold SPA - fully
executed
From: <compliance@cuentas.com>
Date: Mon, December 03, 2018 7:04 pm
To: "arik@cuentas.com" <arik@cuentas.com>,
compliance@cuentas.com
Cc: "Michael De Prado"
<michael@nextgroupholdings.com>, "james
goldberg"
<JAMES_GOLDBERG@msn.com>,
michael@cuentas.com

B"H

Re:  Cuentas-Rozgold SPA - fully executed

Please forward to Steve and confirm receipt of this email.

Once the funds are confirmed via wire
tomorrow morning, we will instruct our
transfer agent to complete the book entry and
issue physical certs to the names you provide
to us in writing.

If you have any questions or comments,
please contact me as listed below.

Best Regards,

Matthew
=================
Matthew Schulman - VP Compliance
Meimoun & Mammon, LLC
dba M & M Telecom, dba Tel3 & Next Mobile
360
A Cuentas Company (OTCQB: CUEN)
19 W. Flagler St.
Suite 507
Miami, Florida 33130
Tel: (786) 229-2222
**Email:** compliance@cuentas.com

_____

To Whom it may concern,

Please change my certificates from my purchase of Next Group Holdings to the name of Troy James Hogg or any other name Mr Hogg so chooses.

Sincerely,

Stephen Braverman

President, Rozgold Capital.



## Exhibit F Synopsis

June 1, 2020 Olde Monmouth put Plaintiff counsel Simon Kogan on notice of the 30 days. Subsequently, also reminding counsel to forward the adverse claim.

The adverse claim was forwarded and the thirty days had already begun lawfully on notice. Due to Covid19 and the special mandated limitations, the restraining order was not obtained sooner. Further evidence of this statement can be rendered to support this fact.

Now, that the courts are opened in parts and not solely adjourned or virtual. We commence this battle by 100 mile bulge from Olde Monmouth Stock Transfer in Atlantic Heights NJ , to the Easter District Of New York.

Counsel for the defendant "Braverman" Rozgold, reached out to pertinent parties to introduce his clients interests. Which is to sell the Plaintiff's shares.

The adverse claim opposes such action and the injunction and restraining order serves to seal that edict. Hence, if we find favor with court magistrate on the matter.

Case 1:20-cv-02862-BMC    Document 1    Filed 06/29/20    Page 89 of 109 PageID #: 89

 Gmail                    Simon Kogan <simonkoganlaw@gmail.com>

## FW: Rozgold Cuentas Shares

**Matt Troster** <matt@oldemonmouth.com>          Mon, Jun 1, 2020 at 2:01 PM
To: Simon Kogan <simonkoganlaw@gmail.com>

Simon,

*Still have not received the adverse claim notice back from you regarding Rozgold shares in CUEN.  Please be advised that Stephen Braverman has asked for physical delivery of these shares. Please consider this our notice to you.*

*Thank you,*

*Matt-*

Olde Monmouth Stock Transfer Co., Inc.

Matthew J. Troster - President

200 Memorial Parkway

Atlantic Highlands, NJ  07716

Phone (732) 872-2727, Ext 101

Fax (732) 872-2728

matt@oldemonmouth.com

**From:** Stephen Braverman <sbraverman22@gmail.com>
**Sent:** Monday, June 1, 2020 1:51 PM
**To:** Matt Troster <matt@oldemonmouth.com>
**Subject:** Fwd: Rozgold Cuentas Shares

**Shares**

**Matt, please create and send me the Cuentas shares in certificate form ASAP. My address is** 3916 Greenwood Street, Newbury Park, California 91320. **Thank you!**

Sent from my iPhone

Begin forwarded message:

> **From:** Stephen Braverman <sbraverman22@gmail.com>
> **Date:** June 1, 2020 at 10:50:04 AM PDT

6/16/2020

Gmail – FW: Rozgold Cuentas Shares

**To:** Stephen Braverman <sbraverman22@gmail.com>
**Subject: Re: Rozgold Cuentas Shares**

**Matt, please create and send me the Cuentas shares in certificate form ASAP. My address is** 3916 Greenwood Street, Newbury Park, California 91320. **Thank you!**

Sent from my iPhone

On May 24, 2020, at 8:20 AM, Stephen Braverman <sbraverman22@gmail.com> wrote:

Thank you Matt. Much appreciated.

Sent from my iPhone

On May 24, 2020, at 8:10 AM, Matt Troster <matt@oldemonmouth.com> wrote:

Olde Monmouth Stock Transfer Co., Inc.

Matthew J. Troster – President

200 Memorial Parkway

Atlantic Highlands, NJ  07716

Phone (732) 872-2727, Ext 101

Fax (732) 872-2728

matt@oldemonmouth.com

**From:** Stephen Braverman <sbraverman22@gmail.com>
**Sent:** Friday, May 22, 2020 4:02 PM
**To:** Matt Troster <matt@oldemonmouth.com>
**Subject:** Rozgold Cuentas Shares

Matt,

I've been waiting on the document we spoke about earlier. Please send it asap.,

Stephen Braverman

516-398-4617

<Rozgold - Statement.pdf>

### ADVERSE CLAIM NOTICE

Date:  5/18/20

Olde Monmouth Stock Transfer Co., Inc.
200 Memorial Parkway
Atlantic Highlands, NJ 07716

Gentlemen:

The undersigned hereby gives notice of his/her/its adverse claim against the following securities or financial assets and demands that Olde Monmouth Stock Transfer Co., Inc. ("Olde Monmouth") place a "STOP TRANSFER" instruction against such securities or financial assets and in the event that they are presented for transfer to promptly notify the undersigned of such presentation:

Issuer Company:  CUENTAS INC.

Cert#  # Shares 100,000  Shareholder Name: ROZGOLD CAPTITAL LLC

The undersigned acknowledges awareness that, if and when notified by Olde Monmouth that the securities or financial assets have been presented for transfer, he/she/it will have a limited time of thirty (30) days to obtain an order, from a competent court, to restrain the transfer pending adjudication of the adverse claim and/or (as determined by Olde Monmouth) to furnish an acceptable indemnity bond in a sufficient amount to protect Olde Monmouth against any possible expense or loss.   Further, the undersigned acknowledges that in the event of his/her/its failure to obtain the restraining order and/or indemnity bond, Olde Monmouth, in its sole discretion and without further notice, may ignore the STOP TRANSFER instructions and notice of adverse claim and process any requested transfer of the securities or financial assets.

The undersigned hereby indemnifies Olde Monmouth against, and agrees to hold Olde Monmouth harmless from, any and all claims, actions, suits, and complaints, whether groundless or otherwise, and all losses, expenses, costs, damages, and charges, including attorney's fees and court costs, arising from or by reason of Olde Monmouth's following of the undersigned's assertion of the adverse claim hereby noticed and the placement of STOP TRANSFER instructions.

ENTITY CLAIMANT:

By:  Title:

INDIVIDUAL CLAIMANT:  TROY HOGGS

Signed:

Notifications: Email: SIMONKOGANLAW@GMAIL.COM  Telephone:  646 - 983 - 0791

Street Address: 25 FANNING STREET  520 A

City:  STATEN ISLAND  State:  NY  Zip:  10314

legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information; please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy. Although this email and any attachments are believed to be free of any virus or other defect that may affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use.

**From:** compliance@cuentas.com <compliance@cuentas.com>
**Sent:** Monday, June 22, 2020 3:08 PM
**To:** james goldberg <JAMES_GOLDBERG@msn.com>
**Cc:** Michael De Prado <michael@cuentas.com>
**Subject:** [FWD: Cuentas, Inc./Stock Transactions with Rozgold Capital, LLC]

B"H

If you have any questions or comments, please contact me as listed below.

Best Regards,

Matthew
================
Matthew Schulman - VP Compliance
Cuentas Inc. (OTCQB: CUEN)
200 S. Biscayne Blvd.
Suite 5500
Miami, Florida 33131
Tel: (786) 229-2222
Email: compliance@cuentas.com

The information in this e-mail is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient please delete. Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Cuentas, Inc.

—— Original Message ——
Subject: Cuentas, Inc./Stock Transactions with Rozgold Capital, LLC
From: "Denmon, Richard A." <rdenmon@carltonfields.com>
Date: Tue, May 19, 2020 2:57 pm
To: "'compliance@cuentas.com'" <compliance@cuentas.com>
Cc: 'Stephen Braverman' <sbraverman22@gmail.com>

Dear Mr. Schulman:

I represent Rozgold Capital, LLC ("Rozgold") and its principal, Stephen Braverman ("Mr. Braverman"), and I am assisting my client in connection with its holdings of common stock of Cuentas, Inc. (the "Company"). My client advised me that you are the compliance officer for the Company and I thought I would informally reach out to you for some assistance.

I have reviewed the Securities Purchase Agreement ("SPA") between Rozgold and the Company entered into in December 2019, as well as my client's securities position listing with Olde Monmouth Stock Transfer ("Transfer Agent"). It appears that pursuant to the SPA my client purchased 99,334 units of Common Stock and Warrants in exchange for $300,000 (the "Purchase Transaction"), and I have a few questions/requests with respect thereto:

Case 1:20-cv-02862-BMC   Document 1   Filed 06/29/20   Page 93 of 109   PageID #: 93

- The Transfer Agent accounts shows book entries for 82,667 common shares of restricted stock held by my client. My client advises me that the Transfer Agent requested hard certificates from the Company for the remaining 16,667 shares of common stock and they have not been returned. Do you have a status update on this? This is time sensitive matter and my client wishes to receive its stock certificate as quickly as possible in order to take the steps necessary to sell such shares under Rule 144 (referenced below).

- In connection with the Purchase Transaction, my client was to receive at closing of the Purchase Transaction (the "Closing") a physical Warrant to purchase up to 99,334 additional shares of the Company's Common Stock. My client has not received this Warrant. Could you check on the status of this and let me know when my client can expect receipt?

- Under the terms of the SPA, my client also was given a pro rata right to participate in certain subsequent offerings and financings for the 2-year period following the Closing. My client has not received any notification of any such subsequent financings. Could you please confirm that the Company has not engaged in any such subsequent financings since the date of the Closing?

- The SPA also provided my client with certain anti-dilution protections in the event that the Company should engage in certain sales of Common Stock and common stock equivalents for less than $3.00 per share ("Dilutive Sales"). In such an event, my client was to be issued additional shares of Common Stock or the right to exchange its shares on a $1.00 invested basis for $1.00 acquisition basis. Could you please confirm that the Company has not engaged in any such Dilutive Sales since the date of the Closing?

- My client is interested is selling some of its Common Stock holdings pursuant to Rule 144, all in accordance with the SPA. In view of the length of time it has held these shares, please confirm that the Company will not require an opinion of counsel for such sales. If an opinion will be required, please confirm that the Company will furnish the necessary factual certificates to support any such opinion, as well as a waiver that any purchaser of shares in an open market transaction pursuant to Rule 144 will not be required to sign the SPA.

- Finally, to the extent that my client is unable to take advantage of the current market for the Common Stock due to any delays or otherwise, please advise how the Company would like to proceed with processing any potential Sale Reconciliation (a defined in the SPA).

As I indicated above, I am assisting my client in getting their investment arrangements with the Company in order and I would greatly appreciate any assistance that you can provide me in that regard.

Kindest regards,

Rick



Case 1:20-cv-02862-BMC   Document 1   Filed 06/29/20   Page 94 of 109   PageID #: 94

**Richard A. Denmon**
Attorney at Law

4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607-5780
Direct: 813.229.4219 | Fax: 813.229.4133

rdenmon@carltonfields.com | www.carltonfields.com
bio | vcard

***COVID-19 NOTICE****: All our offices are "open for business" at this time although in some jurisdictions we are operating only remotely. Across our offices, we have limited all "non-essential" in-person meetings. Our firm will remain fully functional during this time and we are available by email and phone.*

**Carlton Fields is ISO 27001:2013 certified**

*Confidential: This e-mail contains a communication protected by the attorney-client privilege or constitutes work product. If you do not expect such a communication please delete this message without reading it or any attachment and then notify the sender of this inadvertent delivery.*



Page 1

# EXHIBIT G
## PART I & II

## Page 1 :Text Message from Troy's Cell.

Screenshot of Communication between Troy ( blue ) and Steve Crypto "Braverman" ( gray).

1. Plaintiff says, "To the account above" On his cell phone apps. For security purposes we will not name the Bitcoin app that held his valuable Bitcoins. Plaintiff was able to monitor the transaction in real - time with the latest technology.

2. Troy directs the payment to go to Arik the CEO & Chairman of at that time NEXT GROUP HOLDINGS & now CUENTAS INC.

3. Furthermore, Troy asked for a receipt of the transaction once complete and receives a copy of that transaction via Braverman "Rozgold" scanning the receipt and text messaging Troy the proof.

## Page 2: Outgoing Wire Transfer

*From*: Wells Fargo, Stephen Braverman "Rozgold"

*To*: Arik Maimon at : Next Group Holdings (Cuentas Inc.)

*Purpose Of Funds*: **Final Payment**

*Amount*: **$ 50,000**

Let this Exhibit serve to prove that Plaintiff Troy Hogg was rendering payments for Cuentas shares through the "entity" Rozgold, which acted as agent "not owner" of the shares. The purpose of the funds are clearly visible from the receipt as last payment. See Exhibit B where Plaintiff indicates there three wires for the purchase of the stock. Also, the Stock Transfer agent share certificate shows three separate book

IMG_4606.jpg

Page 2



Steve - Crypto >

$50,000 to Arik

Balance to my account above

Ok

Thanks

Please send me the receipts as soon as you have completed the wires



Page 3



# Wire Transfer Services
## Outgoing Wire Transfer Request

Wells Fargo Reference Number:

Today's Date: |01 /07/2019
Office/Portfolio Number: |CH153

Banker Name: |RODOLFO RUIZ
Banker NAC: |E2303-011

Banker Phone: |805/376-1760    Branch Number: |04964    Banker AU: |0000194

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on page
Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican
SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

Originator Name: |STEPHEN BRAVERMAN
Street Address: 3916 GREENWOOD ST
Address Line 2:

Primary ID Type: |DLIC
Primary ID Description: |Y3168719

Primary ID St/Ctry/Prov.: |CA
Primary ID Issue Date: |12/21/2015
Primary ID Expiration Date: |06/30/2020
City: HENBURY PARK

Secondary ID Type: |PINV
Secondary ID Description: |PIN Validation
ZIP/Postal Code: 91320-5222

Secondary ID State/Country:
Secondary ID Issue Date:
Secondary ID Expiration Date:
Home Phone:

Account Name: |ROZGOLD CAPITAL, LLC
Bank/COL |0011

## Wire Amount and Source of Funds

Create AU: |0000194
Amount (US Dollars): |$50,000.00
Debit Wells Fargo Account: |1997316383

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

Beneficiary/Recipient Name: NEXT GROUP HOLDINGS INC
Name/Address Line 1: 1 FLEET WAY

Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): 229056506038
Name/Address Line 2:

Purpose of Funds: FINAL PAYMENT
Name/Address Line 3: SCRANTON, PA, US
Beneficiary Phone Number:

Additional Instruction:

# Customer C

66603 (9-18 SVP)

# EXHIBIT G SYNOPSIS

The following Exhibits depicts the defendants FINRA Broker Profile.

Defendant Braverman's work historically depicts his involvement and exposure to multitudes of seedy Broker/Dealers. For over a decade, the defendant spent twelve years slipping out the back door right before investigations concluded fraudulent actors and transactions that were putting investors at risk. FINRA expelled, not one but six firms that the defendant worked in. Oddly, each and every firm within a seven year period that the defendant was employed at, was expelled by FINRA. The cultural climate to which the defendant had grown accustomed attests to not only his perception, but also his treatment of Canadian investor and tech entrepreneur Troy Hogg. Whose only misfortune was living to regret a series of three Bitcoin transactions with the defendant.

Investor Troy Hogg is a software engineer and a technological genius. Mr. Hogg is a termed inventor and "visionary". He became involved with the defendant because he wanted to invest in his future retirement. Troy Hogg takes care of his elderly father and is a well respected family man. His objective was to broaden his investments over the next few decades to supplement his family in his latter retirement years. Until he met the defendant.

In a variety of sinewy double dealing moves, defendant seeks to now attempt to dignify his ill intent against plaintiff. Furthermore, it can be inferred that bad habits are hard to break and proceed to the corporate climate and personal dealings. Thus announcing his desire to "illegally" use the plaintiff's funds. "Braverman" was at multiple firms in a short period of time and had multiple judgment/liens which is a red flag. He also worked for more than six firms that were expelled another red flag. The last firm he worked for was a firm he had already worked there and they must have been aware of all this. Aside from the Broker Check from FINRA annexed to Exhibit G - Also, the internet contains much information online through Twitter and other sources that chronicle Braverman's activities.

*"Braverman" was a wolf in sheeps clothing, working amongst a multitude of expelled firms.*

FINRA Rule 3110(e), which requires a firm to ascertain by investigation the good character, business reputation, qualifications and experience of an applicant before it registers that applicant with FINRA. Firms are advised to consider all available information gathered in the pre-registration process for this purpose, including Form U4 and U5 responses, searches of the CRD system, fingerprint results, private background checks and communications with previous employers. In addition, FINRA strengthened the background check obligations of firms by requiring firms to adopt written procedures reasonably designed to verify the accuracy of completeness of the information contained in the applicant's Form U4. See also Notice to Members 97-19.


FINRA also requires heightened supervision in some cases when a firm hires numerous individuals from a disciplined firm. In such cases, a firm can become a "taping firm," and be required to tape record all of its registered persons' phone calls with investors. See FINRA Rule 3170 (Tape Recording of Registered Person by Certain Firms).

Footnotes from Regulatory Notice 18-15. As many Tax liens go to business reputation. Why would anyone hire a guy to manage other people's money, when he can't even manage his own? Multiple firms go to qualification and experience. Working at so many firms that were later closed by FINRA goes to requiring heightened supervision.

## STEPHEN LANCE BRAVERMAN
(STEVEN L BRAVERMAN)

CRD#: 1731936

(PR) Previously Registered Broker



| 11 Disclosures | 20 Years of Experience 19 Firms | 6 Exams Passed | 0 State Licenses |
|---|---|---|---|

Disclosure(s) ⓘ

View By:  Date  ▼

| 7/1/2013 | Judgment / Lien | ⌄ |
|---|---|---|

Judgment/Lien Amount        $10,340.00

Judgment/Lien Type          Tax

| 3/30/2012 | Judgment / Lien | ⌄ |
|---|---|---|

Judgment/Lien Amount        $35,539.00

Judgment/Lien Type          Civil

6/24/2020                                   STEPHEN LANCE BRAVERMAN - BrokerCheck

Broker Comment                 In 2007 I had $645,000 stolen from me by Alan Weiner of
                               Secure Trading Group. My car was repossessed.


12/1/2009                      Judgment / Lien                                      


Judgment/Lien Amount           $22,119.00


Judgment/Lien Type             Tax


Broker Comment                 In 2007 $645,000 was stolen from me by Alan Weiner of
                               Secure Trading Group. I was unable to recover financially from
                               this.


8/24/2009                      Judgment / Lien                                      


Judgment/Lien Amount           $2,131.00


Judgment/Lien Type             Tax


Broker Comment                 In 2007 I had $645,000 stolen from me by Alan Weiner of
                               Secure Trading Group. I was never able to recover financially.

STEPHEN LANCE BRAVERMAN - BrokerCheck

| 5/26/2009 | Judgment / Lien |
|---|---|

| Judgment/Lien Amount | $11,430.00 |
|---|---|

| Judgment/Lien Type | Civil |
|---|---|

| Broker Comment | In 2007 I had $645,000 stolen from me by Alan Weiner of Secure Trading Group. I was never able to financially recover. |
|---|---|

| 2/13/2009 | Judgment / Lien |
|---|---|

| Judgment/Lien Amount | $468.00 |
|---|---|

| Judgment/Lien Type | Civil |
|---|---|

| Broker Comment | In 2007 I had $645,000 stolen from me by Alan Weiner, the President of Secure Trading Group. Mr. Weiner went to prison and I was unable to recover my capital. I was never able to recover financially. |
|---|---|

| 9/10/2008 | Judgment / Lien |
|---|---|

| Judgment/Lien Amount | $1,998.00 |
|---|---|

| Judgment/Lien Type | Civil |
|---|---|

STEPHEN LANCE BRAVERMAN - BrokerCheck

Broker Comment

In 2007 I had $645,000 stolen from me by Alan Weiner of Secure Trading Group. My home was foreclosed because of this. The deal I made with the bank was for me to leave the home, the bank was supposed to pay the utilities. They obviously didn't pay.

6/21/2008                        Judgment / Lien                                    

Judgment/Lien Amount            $42,458.00

Judgment/Lien Type              Civil

Broker Comment                  In 2007 I had $645,000 stolen from me by Alan Weiner of Secure Trading Group. My car was repossessed. I was never contacted about any court dates or judgements.

2/4/2008                         Judgment / Lien

Judgment/Lien Amount            $13,424.00

Judgment/Lien Type              Tax

Broker Comment                  In 2007 $645,000 was stolen from me by Alan Weiner of Secure Trading Group. I was unable to recover financially from this.

STEPHEN LANCE BRAVERMAN - BrokerCheck



| 12/7/2006 | Judgment / Lien |
|---|---|

**Judgment/Lien Amount**  $41,011.00

**Judgment/Lien Type**  Tax

**Broker Comment**  In 2007 I had $645,000 stolen from me by Alan Weiner of Secure Trading Group. I was never able to recover financially. I have attempted numerous offers and compromises



| 4/19/2006 | Judgment / Lien |
|---|---|

**Judgment/Lien Amount**  $100,562.00

**Judgment/Lien Type**  Tax

**Broker Comment**  In 2007 I had $645,000 stolen from me by Alan Weiner of Secure Trading Group. I have known about this and have attempted numerous offers and compromises to no avail.

Examination(s)

■ **State Securities Law Exam**



Series 63 – Uniform Securities Agent State Law Examination
Jul 27, 2016

6/24/2020

STEPHEN LANCE BRAVERMAN - BrokerCheck

### ▣ General Industry/Products Exam

Ⓑ  SIE - Securities Industry Essentials Examination
Jun 29, 2018

Ⓑ  Series 57 - Securities Trader Exam
Jun 9, 2016

Ⓑ  Series 55 - Limited Representative-Equity Trader Exam
Apr 10, 2000

Ⓑ  Series 7 - General Securities Representative Examination
Jan 20, 1990

### ▣ Principal/Supervisory Exam

Ⓑ  Series 24 - General Securities Principal Examination
Jun 29, 2016

Additional information including this individual's professional designations is available in the Detailed Report.

Previous Registration(s)

CLEARVIEW TRADING ADVISORS, INC. (CRD#:142873)
NEW YORK, NY
05/11/2016 - 06/29/2018

MAXIM GROUP LLC (CRD#:120708)
NEW YORK, NY
04/08/2010 - 06/10/2010

LEGEND TRADING, LLC (CRD#:150567)
NEW YORK, NY
01/28/2010 - 02/04/2010

QUAD CAPITAL, LLC (CRD#:148927)
NEW YORK, NY
07/23/2009 - 10/13/2009

CLEARVIEW TRADING ADVISORS, INC. (CRD#:142873)

NEW YORK, NY

03/04/2008 - 07/21/2009


TOUCHPOINT SECURITIES CORP. (CRD#:137224)
MERRICK, NY
05/18/2007 - 02/20/2008


WESTOR CAPITAL GROUP, INC. (CRD#:103823)
⚠ **FINRA expelled the firm on 06/19/2013**
BELLMORE, NY
06/13/2006 - 02/26/2007


BLOCK ORDERS EXECUTION, LLC (CRD#:134932)
WESTBURY, NY
10/07/2005 - 06/12/2006


ELECTRONIC BROKERAGE SYSTEMS, LLC (CRD#:104031)
CHICAGO, IL
05/16/2005 - 12/16/2005


STG SECURE TRADING GROUP, INC. (CRD#:41216)
⚠ **FINRA expelled the firm on 10/18/2007**
BOCA RATON, FL
08/28/2002 - 05/18/2005


ALEXANDER, WESCOTT, & CO., INC. (CRD#:35935)
⚠ **FINRA expelled the firm on 11/12/2002**
UTICA, NY
07/09/2001 - 08/14/2002


ALEXANDER, WESCOTT, & CO., INC. (CRD#:35935)
⚠ **FINRA expelled the firm on 11/12/2002**
UTICA, NY
07/09/2001 - 07/12/2002


WIN CAPITAL CORP. (CRD#:36172)
⚠ **FINRA expelled the firm on 02/26/2004**
BAYVILLE, NY
05/11/2001 - 07/09/2001

ANDOVER BROKERAGE, L.L.C. (CRD#:33848)

MONTEBELLO, NY

08/16/2000 - 05/11/2001


GRUNTAL & CO., L.L.C. (CRD#:372)

NEW YORK, NY

12/10/1999 - 08/17/2000


ALEXANDER, WESCOTT, & CO., INC. (CRD#:35935)

⚠ **FINRA expelled the firm on 11/12/2002**

UTICA, NY

03/13/1998 - 10/27/1999


FIRST NEW YORK SECURITIES L.L.C. (CRD#:16362)

NEW YORK, NY

12/18/1997 - 02/06/1998


KNIGHT SECURITIES, L.P. (CRD#:38599)

JERSEY CITY, NJ

07/13/1995 - 07/21/1997


TRIMARK SECURITIES, L.P. (CRD#:38379)

PURCHASE, NY

04/18/1995 - 06/24/1997


TRIMARK SECURITIES, INC. (CRD#:17232)

WHITE PLAINS, NY

04/06/1995 - 04/18/1995


MURPHY & DURIEU (CRD#:6292)

⚠ **FINRA expelled the firm on 07/14/2015**

NEW YORK, NY

02/02/1995 - 02/17/1995


A.J. MICHAELS & CO., LTD. (CRD#:19883)

HAUPPAUGE, NY

09/07/1994 - 12/14/1994


TRIMARK SECURITIES, INC. (CRD#:17232)

WHITE PLAINS, NY

01/23/1990 - 09/12/1994